[No. E001700. Fourth Dist., Div. Two. Aug. 6, 1986.]

C. ROBERT NATTRESS & ASSOCIATES et al.,
Plaintiffs and Respondents, v.
CIDCO et al., Defendants and Appellants.

COUNSEL

Best, Best & Krieger, Barton C. Gaut and Virginia A. Ettinger for Defendants and Appellants.

Reid & Hellyer, Donald F. Powell, Alexandra S. Ward, Wyman, Bautzer, Rothman, Kuchel & Silbert and Thomas R. Malcolm for Plaintiffs and Respondents.

## OPINION

**KAUFMAN, J.**—Defendants John Michels, Raymond Magnon, Charles Sutherland and CIDCO appeal from a judgment of specific performance in favor of plaintiffs C. Robert Nattress & Associates and C. Robert Nattress as an individual. The judgment ordered defendants CIDCO and Sutherland to sell to plaintiffs a commercial building in the City of Riverside pursuant to an agreement for purchase and sale of the building that was expressly made subject to a right of first refusal held by defendant Michels, the building's principal tenant. The judgment also required defendants Michels and Magnon, who had obtained title to the building from CIDCO and Sutherland by purporting to exercise Michels' right of first refusal, to relinquish the building and transfer title to plaintiffs. Finally, the judgment required defendants CIDCO and Sutherland to pay "plaintiff" a real estate commission of $40,582. (Hereafter the appellation Sutherland shall also include CIDCO unless the context indicates otherwise.)

On appeal, defendants contend the judgment must be reversed because the evidence shows: (1) that plaintiffs failed to prove the property was unique as to them or that they were ready, willing and able to perform their contract to purchase the property; (2) that Michels and Magnon effectively exercised Michels' right of first refusal so plaintiffs were entitled to no recovery; and (3) that in any event plaintiff C. Robert Nattress as an individual had no right to specific performance. Failing all else, defendants

contend the court erred in refusing to order them reimbursed for their expenditures for maintenance of and improvements to the property during their interim ownership.

*Facts*

Magnon, Sutherland and Claire Taber were general partners in CIDCO. The CIDCO partnership owned several parcels of real property including the subject of these proceedings, an industrial building in Riverside referred to as the Hops Building.

In about August 1978, Sutherland purchased the partnership interests of Taber and Magnon and thereafter was the sole owner of the Hops Building although record title remained in the CIDCO name. As the result of the buyout and other transactions dating back to 1974, Sutherland was considerably in debt to his former partner Magnon. These debts were evidenced by several promissory notes from Sutherland to Magnon, including one dated August 30, 1978, in the amount of $150,000 and three bearing dates in 1974 in an aggregate original principal amount in excess of $141,000.

Defendant Michels occupied one-half the Hops building under a lease to John S. Michels, Inc., doing business as Hops Distributing Company. The lease term commenced in 1975 and continued through 1978. The lease gave Michels a right of first refusal in the event the lessor decided to sell, which is set out in the margin.[1]

On or about November 27, 1978, C. Robert Nattress and Associates, a limited partnership of which C. R. Nattress was the general partner, made a written offer to purchase the Hops building for $676,382, payable in the form of $310,582 cash and the assumption of a $365,800 obligation secured by an existing first trust deed on the property. $40,582 of the $310,582

---

[1] *"Right of Lessee to Purchase. . . .* During the term of this lease, or any extension thereof, Lessor shall not sell or agree or offer to sell the demised premises of the industrial facility without giving Lessee the right of first refusal to purchase the demised premises or the industrial fac. or any part thereof, and in the event that Lessor should desire to make any such sale, Lessor shall notify Lessee in writing of the terms and conditions of any bona fide offer to purchase the demised premises or the shopping center or any part thereof and thereupon, for a period of thirty (30) days from the receipt of said notice, Lessee shall have an option to purchase the demised premises or the industrial facility or any part thereof, as the case may be, on the same terms and conditions so offered. In the event Lessee shall not give Lessor notice within said thirty (30) day period of Lessee's election to purchase the demised premises or the industrial facility or any part thereof upon the terms and conditions specified in said offer, Lessor may thereafter sell the demised premises or the industrial facility or any part thereof, as the case may be, to the party making the offer or to said party's nominee; subject, however, to the leasehold estate created by this lease and all the terms and provisions of this lease . . . ."

cash represented a broker's commission to be paid by Sutherland to Nattress personally. The total cash to be received by Sutherland from the escrow was therefore $270,000. Sutherland for himself and CIDCO accepted the offer subject to Michels' right of first refusal on December 8, 1978, and an escrow was opened. Nattress had read the Michels lease and talked to Michels and was fully aware of the outstanding right of first refusal before making the offer to purchase and the escrow instructions expressly provided the transaction was subject to the right of first refusal.

Despite some earlier indications by Michels in telephone conversations with Nattress that he was not then interested in exercising his right of first refusal, Michels, Magnon and Sutherland had a meeting on January 5, 1979, at which Michels informed Sutherland that he and Magnon intended to exercise the right. In essence the plan was that Michels and Magnon, who was Michels' former partner in CIDCO and also apparently an occupant of a portion of the building, would purchase the building as tenants in common. The total purchase price was to be the same price as offered by the Nattress limited partnership less the $40,582 commission to be paid to Nattress under the Nattress offer. Michels and Magnon would assume the existing $365,800 first trust deed on the property and pay the balance of $270,000 as follows: Michels would pay one-half, $135,000, in cash. However, $85,000 of the $135,000 would be paid to Magnon in satisfaction of part of Sutherland's outstanding debt to Magnon. Magnon was to pay his half of the $270,000 by giving Sutherland credit for $135,000 against Sutherland's $150,000 note to Magnon. In cash and debt reduction, therefore, Sutherland was to receive the same amount from Michels and Magnon as would have been received if the property were sold to plaintiffs.

A "MEMORANDUM OF AGREEMENT" dated January 5, 1979, was signed between Sutherland and Michels in which Michels expressed his intent to exercise the preemptive right to purchase. However, at its end the memorandum stated: "The above is subject to JOHN S. MICHELS and RAY MAGNON making an agreement, which is not applicable to this transaction, on or before January 12, 1979."

Michels thereafter sent Sutherland a letter dated January 11, 1979, which read in pertinent part: "I am notifying you that I am hereby exercising my option under the terms of our January 5, 1979 signed agreement to purchase one-half interest in the Hops Building at 1616 Marlborough Avenue, Riverside, California, subject to the conditions of the escrow instructions, which are being initiated. In addition, it is understood and agreed to by both Ray Magnon and myself that we will hold title to the Hops Building as Tennants [*sic*] in Common. [¶] As soon as you receive said escrow instructions, please

notify Sunset Escrow to cancel Escrow Number 16480 [the Sutherland-Nattress escrow] immediately.''

Sutherland then notified Nattress that the right of first refusal had been exercised and that the agreement for purchase and sale with C. Robert Nattress and Associates was thus cancelled. The new escrow between Sutherland, Michels and Magnon opened on February 2, 1979, on the terms and conditions discussed at the January 5 meeting, and in due course the escrow closed and Michels and Magnon took title to the property. Title to Michels' half interest was vested at his direction in a trust created by him, the John Spiegel Michels Trust No. 1, and title to Magnon's half interest was vested at his direction in another of his partnerships, Marlborough Square North.

When he was notified by Sutherland the right of first refusal had been exercised, Nattress acknowledged the notice and asked to have sent to him a copy of the Sutherland-Michels-Magnon escrow instructions. Though this request was repeated several times, no copy of those escrow instructions was furnished Nattress, so he refused voluntarily to cancel the Nattress-Sutherland escrow, and ultimately instituted this action.

The complaint was in three counts: specific performance and constructive trust, damages for breach of contract, and fraud. The fraud count charged in substance that the purported exercise by Michels and Magnon of the right of first refusal was in reality a subterfuge concocted between Michels, Magnon and Sutherland to avoid having to sell the property to C. Robert Nattress and Associates and to avoid having to pay C. Robert Nattress individually the $40,582 real estate commission. The specific performance and breach of contract counts were bottomed on the claim the purported exercise of the right of first refusal was ineffective because the purchase by Michels and Magnon was on terms different from those offered by the Nattress limited partnership.

The trial court found against plaintiffs on the claim of fraud, expressly striking from the statement of decision proposed by plaintiffs language impugning the bona fides of the Michels-Magnon purchase or indicating it was a subterfuge. However, the court found for both plaintiffs on the specific performance-constructive trust count and for plaintiff C. Robert Nattress as an individual for his commission on the breach of contract count, the court having determined the purported exercise of the right of first refusal was ineffective. The statement of decision reads in pertinent part:

"25. As to the optionee (Michels), an option is an irrevocable offer that can be accepted only in strict conformity with the terms specified in the option. *Simons* v. *Young,* 93 Cal.App.3d 170, 179, 155 Cal.Rptr. 460 (1979).

Where contracts are optional in respect to one party, they are strictly interpreted in favor of the party bound and against the party that is not bound. 3 *Williston on Contracts* § 620, P. 1788.

"26. Michels purported 'acceptance' was invalid and unenforceable for three reasons. First, Michels conditioned his purported 'acceptance' of the option-offer on his reaching an agreement with Magnon. Such a conditional acceptance actually constitutes a rejection of the offer. *Landberg* v. *Landberg,* 24 Cal.App.3d, 742, 750, 756-57, 101 Cal.Rptr. 335 (1972). Further, Michels' rejection of the offer terminated the option he held under the lease agreement. It constituted a counter-offer to Sutherland.

"27. Second, the subsequent Michaels [*sic*]/Magnon offer did not match the price or terms of the plaintiffs [*sic*]. A right of first refusal is a right to elect to take specified property at the same price and on the same terms and conditions as those contained in a good faith offer by a third person. *Coastal Bay Golf Club, Inc.* v. *Holbein* (Fla. 1970) 231 So.2nd 854, 857; see also 4 Miller and Starr, *Current Law of California Real Estate,* Section 27:81, p. 397.

"28. Where the holder of a right of first refusal does not match the price in terms of the offer, the purported election is invalid. *Chevy Chase Services, Inc.* v. *Marceron,* 314 F.2d 275 (D.C. Cir. 1963). . . .

"29. The Michaels [*sic*]/Magnon offer did not match the price or terms of Associates' offer in the following particulars:

"(a) The purchase price was $40,000 less reflecting the buyer's unilateral deduction of the broker's commission; and

"(b) The cash downpayment was only $135,000 compared with $310,582.

". . . . . . . . . . . . . . . . . . . . . . .

"34. . . . Additionally, Michels, the holder of the right of first refusal, only elected to purchase one-half of the property, where the terms of the right of first refusal did not give Michels such an option. Since he did not purchase the entire property, his election is similarly invalid."

Additional facts will be developed in connection with the discussion of several contentions.

## *Discussion*

Preliminarily we note defendants have included in their brief a contention that the trial court's judgment against them on the fraud cause of action is not supported by substantial evidence. However, as plaintiffs accurately point out, the court ruled in defendants' favor on the fraud count, determining that fraud had not been established by the evidence. We therefore do not consider that matter further.

As another preliminary matter, we observe that defendants are quite correct that the judgment should not have purported to grant specific performance to or impose a constructive trust for the benefit of plaintiff C. Robert Nattress individually. Nattress in his individual capacity did not agree to purchase the property; he acted only as a real estate broker on behalf of C. Robert Nattress & Associates (hereafter the Nattress Associates). In view of our other conclusions, however, that error is of no significance.

*Lack of Proof of Inadequacy of Legal Remedy and Buyer's Readiness, Willingness and Ability to Perform*

Defendants are correct that insofar as it orders specific performance and the imposition of constructive trust, the judgment is erroneous because the Nattress Associates, the only party to the action that could conceivably have been entitled to such relief, failed to prove that its remedy at law was inadequate or that it was ready, willing and able to purchase the property under the terms and conditions of its contract with Sutherland. We discuss the two problems together because they and their underlying factual matrices are interrelated if not, indeed, the same.

Ordinarily, specific performance is an available remedy for the breach of a contract to sell real property because real property is considered to be unique and the remedy at law is therefore considered to be inadequate. However, in the case at bench the facts demonstrate that the Nattress Associates had no means with which to purchase the property and, indeed, itself never intended to purchase the property. Both the deposit receipt and the escrow instructions were expressly and advisedly put in the name of C. Robert Nattress & Associates "or Nominee," and it was the intention of both C. Robert Nattress and the Nattress Associates to substitute Mr. George Fruehling, a real estate client of Mr. Nattress, as "the Nominee" and that it would be Mr. Fruehling who would be the buyer of the property.

Mr. Nattress testified that the Nattress Associates did not have the funds necessary to purchase the property for itself and that neither he as general partner nor the limited partners intended to provide any funds for the purchase

of the property except possibly for the initial deposit into escrow of $200. Indeed, at trial plaintiffs did not attempt to prove the Nattress Associates was ready, able or willing to buy the property; their effort was directed at proving that at the time the contract for purchase and sale was entered into between Sutherland and the Nattress Associates, Mr. Fruehling was ready, willing and able to buy the property. However, the evidence that Mr. Fruehling was willing, ready and able to purchase the property at the contract's inception was legally insufficient to support a judgment of specific performance in favor of the Nattress Associates for several reasons.

First, and rather fundamentally, Mr. Fruehling was not made a party to the action, so the court had no jurisdiction over him and was in no position to condition an order of specific performance on payment by him of the purchase price in accordance with the terms of the contract. Secondly, it is axiomatic that to obtain specific performance, a buyer must prove not only that he was ready, willing and able to perform at the time the contract was entered into but that he continued ready, willing and able to perform at the time suit was filed and during the prosecution of the specific performance action. (*Buckmaster* v. *Bertram* (1921) 186 Cal. 673, 677-678 [200 P. 610]; see also *King* v. *Stanley* (1948) 32 Cal.2d 584, 592 [197 P.2d 321]; *Canal-Randolph Anaheim, Inc.* v. *Wilkoski* (1978) 78 Cal.App.3d 477, 493 [144 Cal.Rptr. 474].)

Here, the uncontroverted evidence establishes that Mr. Fruehling did not continue ready, willing and able to purchase the property. The evidence adduced by plaintiffs themselves disclosed that Mr. Fruehling was interested in purchasing the property only for purposes of combining it with other properties to effectuate a tax-free exchange. When it was reported to Mr. Nattress that Michels' right of first refusal had been exercised, Mr. Fruehling, with Mr. Nattress acting as Fruehling's real estate agent, purchased a Carl's Jr. restaurant in another area, combined that with his other properties and effectuated the tax-free exchange. He therefore had no further need for or desire to buy the Hops Building as is clear from the fact he was not made a plaintiff in the action. The tax-free exchange escrow closed on or about March 30, 1979. The present action for specific performance was not commenced until April 23, 1979.

Viewing the proof of Fruehling's one-time readiness, willingness and ability to purchase the property as an attempt to prove that the Nattress Associates was ready, willing and able to perform, the evidence would nevertheless be legally insufficient to support a judgment for specific performance. Even aside from the fact that prior to the commencement of this action, Fruehling had purchased other property to be used in his tax-free exchange so that he was no longer ready, willing and able to purchase the

Hops Building, the evidence discloses that there was never any written agreement between C. Robert Nattress and Fruehling or Fruehling and the Nattress Associates that Fruehling would purchase the Hops building and, indeed, there was no written agreement between Fruehling and the parties with whom he anticipated consummating the tax-free exchange. Thus, at any time either Mr. Fruehling or the persons with whom he hoped to effectuate the tax-free exchange could have withdrawn without any legal liability whatever. ■ In cases where the buyer expects to produce the funds for the purchase of a property from a third person through a loan, courts have required the buyer to prove that the prospective lender had the ability to supply the funds and was legally bound to do so by a contract. (*Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 539-540 [63 Cal.Rptr. 518]; see also *D-K Investment Corp.* v. *Sutter* (1971) 19 Cal.App.3d 537, 546 [96 Cal.Rptr. 830].) ■ The evidence in the instant case discloses that plaintiff Nattress Associates lacked their own funds to complete the purchase and that their ability to perform was wholly dependent upon the willingness of a third party to satisfy the terms of an oral commitment to purchase the building which in turn depended upon oral commitments from yet other parties to purchase the third party's property. That evidence is insufficient to support a finding Nattress Associates was ready, willing and able to purchase the property.

Insofar as it granted plaintiffs specific performance and imposed a constructive trust on the property the judgment was improvident and must be reversed.

*Plaintiffs' Right to Recover Damages*

Having concluded plaintiffs were not entitled to specific performance, we must determine whether plaintiffs were entitled to recover damages for breach of contract. The court awarded plaintiff C. Robert Nattress a real estate commission of $40,582 on that basis. The court did not reach the question of the right of the Nattress Associates to money damages because it erroneously concluded specific performance was proper. However, the propriety of the award of $40,582 to C. Robert Nattress and the answer to the question of whether the Nattress Associates might possibly be entitled to recover damages for breach of contract both turn on the answer to a single question: whether Michels' right of first refusal was effectively exercised. If it was, C. Robert Nattress was not entitled to recover any commission nor were the Nattress Associates entitled to recover money damages, because if the right of first refusal was effectively exercised, there was no breach of contract. We conclude the right of first refusal was effectively exercised.

The trial court gave three reasons for its conclusion the right of first refusal was not effectively exercised: first, that Michels conditioned his purported exercise of the right of first refusal on his reaching a collateral agreement with Magnon; second, that Michels, the holder of the right of first refusal, only elected to purchase one-half of the property which was not permitted by the terms of the right of first refusal; and third, that the terms upon which Michels and Magnon purported to exercise the right of first refusal did not match the price and terms upon which the Nattress Associates offered to purchase. On appeal, plaintiffs assert each of these as a ground upon which the trial court's determination should be upheld. None is persuasive.

### 1. Conditional Exercise of the Right

The trial court treated the right of first refusal as an option which it defined as "an irrevocable offer that can be accepted only in strict conformity with the terms specified in the option." It then treated the purported exercise of the right of first refusal as a purported "acceptance" of the "offer" and concluded that "[s]uch a conditional acceptance actually constitutes a rejection of the offer. [Citation.] Further, Michels' rejection of the offer terminated the option he held under the lease agreement. It constituted a counter-offer to Sutherland." Plaintiffs employ the same terminology and thereby perpetuate a misconception.

We can readily agree that a right of first refusal, that is, a preemptive right to purchase property on the terms and conditions of an offer to purchase by a third person becomes an option of sorts after a bona fide offer to purchase has been made to the owner by a third person. (See *Rollins* v. *Stokes* (1981) 123 Cal.App.3d 701, 710 [176 Cal.Rptr. 835]; *Mercer* v. *Lemmens* (1964) 230 Cal.App.2d 167, 171 [40 Cal.Rptr. 803].) It is also true that numerous reported cases describe an option as an "irrevocable offer." (See *Palo Alto Town & Country Village, Inc.* v. *BBTC Company* (1974) 11 Cal.3d 494, 499-504 [113 Cal.Rptr. 705, 521 P.2d 1097]; *Landberg* v. *Landberg* (1972) 24 Cal.App.3d 742, 751 [101 Cal.Rptr. 335].) Similarly, numerous decisions refer to the exercise of an option as the "acceptance" of the "irrevocable offer." (*Ibid.*)

Perhaps a more accurate definition of an option might be that given in *Caras* v. *Parker* (1957) 149 Cal.App.2d 621, 626 [309 P.2d 104]: "[A]n option is a contract by which the owner of property invests another with the exclusive right to purchase said property at a stipulated sum within a limited or reasonable time in the future." (See also *Landberg* v. *Landberg, supra,* 24 Cal.App.3d 742, 751; *Schmidt* v. *Beckelman* (1960) 187 Cal.App.2d 462, 470 [9 Cal.Rptr. 736].) In any event, however, in applying

to options rules of offer and acceptance applicable in the formation of a contract, it is vital to bear in mind that in the case of an option a contract already exists and the so-called "offer" is truly irrevocable during the term of the option. (See *Palo Alto Town & Country Village, Inc.* v. *BBTC Company, supra,* 11 Cal.3d 494, 502-504; *Rollins* v. *Stokes, supra,* 123 Cal.App.3d 701, 709.) ■ As observed by this court in *Riverside Fence Co.* v. *Novak* (1969) 273 Cal.App.2d 656, 660 [78 Cal.Rptr. 536]: "An option supported by consideration is an irrevocable offer, *open for a pre-scribed period.*" (Italics added.) Thus, unlike a conditional or qualified acceptance in the formation stage of a contract, a purported exercise of an option which is qualified or made conditional, does not in and of itself terminate the option if there yet remains time during the term of the option in which the unauthorized qualification or condition may be removed and the option exercised absolutely. (Cf. *Riverside Fence Co.* v. *Novak, supra,* 273 Cal.App.2d 656, 662; *Layton* v. *West* (1969) 271 Cal.App.2d 508, 512 [76 Cal.Rptr. 507].)

As stated by this court in the *Riverside Fence Co.* case, "'If the person offering to perform is acting in good faith, and makes the mistake of demanding something to which he is not entitled, he ought to be given the same opportunity to recede from such demand that he is allowed for tendering the correct amount where he has tendered too little, or the right thing where he has tendered the wrong thing. . . .' [Citations.] The foregoing principle has been held to be applicable to a good faith tender of performance in the exercise of an option. (*Hohener* v. *Gauss* [1963] 221 Cal.App.2d 797, 800 [34 Cal.Rptr. 656]; see *Layton* v. *West* [1969] 271 Cal.App.2d 508, 511-512 [76 Cal.Rptr. 507] [hearing den.]; *Alfinito* v. *Sater* [1966] 246 Cal.App.2d 362, 383-384 [54 Cal.Rptr. 636].)" (*Riverside Fence Co.* v. *Novak, supra,* 273 Cal.App.2d 656, 662.)

■ The trial court was therefore incorrect in concluding that Michels' purported exercise of the right of first refusal on January 5, 1979, terminated the option because it was conditioned on the making of a collateral agreement between him and Magnon. The option was exercisable within 30 days after written notice of a bona fide offer from a third person. (See fn. 1, *ante.*) And as we shall explain, the 30-day period did not expire until at least January 12, 1979. Michels' letter to Sutherland dated January 11, 1979, informed Sutherland in effect that Magnon and Michels had made their collateral agreement and that the exercise of the right of first refusal was then unconditional. So the condition was removed or satisfied within the 30-day period.

The only finding made by the trial court as to when Michels was given written notice of the proposal by Nattress Associates to purchase the property was that he had such notice on or before January 5, 1979. However, the

testimony of Mr. Nattress and the telephone bills the plaintiffs introduced into evidence establish the date Michels got written notice as between December 12 and December 20, 1978. Mr. Nattress testified he had at least two telephone conversations with Michels in December 1978. After being asked whether he recalled the substance of any of the conversations, Nattress' testimony was as follows:

"A. This was at a time that the escrow had been opened, and I wanted to confirm with him that he had received a copy of the escrow instructions for the first right of refusal privilege.

"Q. What did he say?

"A. In the first—*I think in the first call I received, he had not received them. And then I, on a subsequent call, I did, he did say that he had received them.* [Italics added.]

"Q. Do you recall the date of that subsequent call?

"A. It was approximately December 18, 1978."

At the right margin of Nattress' telephone bill for December 1978, which was introduced into evidence, are a number of handwritten entries identifying certain charges as having resulted from telephone calls to Michels. There is no call on December 18 identified as representing a telephone conversation with Michels but on December 19 there is one and December 20 there are two, one at 9:07 a.m. lasting one minute and one at 9:40 a.m. lasting four minutes. One of these conversations on December 19 or December 20 must have been the conversation Nattress identified as having occurred on about December 18 in which Michels acknowledged he had received a copy of the Sutherland-Nattress Associates escrow instructions. Not only is that consistent with Nattress' testimony but it is also consistent with Michels' testimony that he did not receive a copy of those escrow instructions until the middle of December. The next preceding call identified as representing a conversation between Nattress and Michels was a six-minute call on December 12 at 9:53 a.m. There is no intervening call, so the conversation in which Michels told Nattress the escrow instructions had not yet been received must have occurred on December 12. That, too, would be consistent with the testimony of both Nattress and Michels. Thus, the evidence establishes that Michels had not received a copy of the escrow instructions on the morning of December 12, 1978, but had received them on the morning of December 19 or 20, 1978. The 30-day period in which the right of first refusal could be exercised therefore extended at least through January 12, 1979. That that was the date of expiration of the 30-day period is confirmed

by the specification in the "MEMORANDUM OF AGREEMENT" between Sutherland and Michels dated January 5, 1979, that the condition a collateral agreement be made between Michels and Magnon was required to be fulfilled "on or before January 12, 1979."

On January 11, 1979, Michels sent Sutherland the letter reading in pertinent part: "I am notifying you that I am hereby exercising my option under the terms of our January 5, 1979 signed agreement . . . ." Clearly, the purpose of that letter was to inform Sutherland that the condition had been fulfilled, that Michels and Magnon had reached agreement on the collateral matter. The letter stated: "In addition, it is understood and agreed to by both Ray Magnon and myself that we will hold title to the Hops building as Tennants [*sic*] in Common."

### 2. *Michels' Purchase of Only One-half of the Property*

■ Another reason given by the court and asserted by plaintiffs for their claim the right of first refusal was not effectively exercised was that ". . . Michels, the holder of the right of first refusal, only elected to purchase one-half of the property, where the terms of the right of first refusal did not give Michels such an option. Since he did not purchase the entire property, his election is . . . invalid." This determination of the court and contention of plaintiffs is also erroneous.

In the first place, we observe it is less than clear that the right of first refusal did not give Michels the right to purchase only one-half the property. The provision giving Michels the right of first refusal read in pertinent part: ". . . Lessee shall have an option to purchase the demised premises or the industrial facility *or any part thereof,* as the case may be, on the same terms and conditions so offered." (Italics added.) However, we need not decide that question. Michels testified in substance that he and Magnon were exercising the right together and, in effect, that he had assigned a one-half interest in the right of first refusal to Magnon. That that is what was being done is clear from the testimony of the parties concerning the meeting on January 5, 1979, Michels' subsequent letter of January 11, 1979, and the Sutherland-Michels-Magnon escrow instructions executed by the parties. An option to purchase contained in a lease of real property is normally assignable (see *Spaulding* v. *Yovino-Young* (1947) 30 Cal.2d 138, 141 [180 P.2d 691]; *Mott* v. *Cline* (1927) 200 Cal. 434, 450 [253 P. 718]), and we are aware of no applicable rule of law that would limit the assignability of Michels' right of first refusal.

Together, Michels and Magnon offered to purchase and did purchase the whole property.

### 3. *Failure to Meet Price and Terms*

The final ground upon which the court found and upon which plaintiffs contend the right of first refusal was not effectively exercised was, in the words of the court: "The Michaels [*sic*]/Magnon offer did not match the price or terms of [the Nattress] Associates' offer in the following particulars: [¶] (a) the purchase price was $40,000 less reflecting the buyers' unilateral deduction of the broker's commission; and [¶] (b) the cash down payment was only $135,000 compared with $310,582." We do not agree.

Both offers were identical in respect to the assumption of the existing first deed of trust, so that presents no problem.

■ Neither do we believe a real difference between the Nattress Associates offer and the offer of Michels and Magnon is to be found in the fact that the Nattress Associates were to pay all cash whereas Michels and Magnon were to pay a combination of cash and credits against debts owed by Sutherland to Magnon. The value received by Sutherland was the same in both instances. Copies of the promissory notes evidencing Sutherland's debts to Magnon, executed months, and in some instances years earlier, were introduced into evidence and the court impliedly found these debts and credits bona fide in rejecting plaintiffs' cause of action for fraud. If Sutherland was willing to accept these reductions in debts as the equivalent of cash, we fail to perceive why plaintiffs should have any legitimate complaint. (Cf. *Rollins* v. *Stokes, supra,* 123 Cal.App.3d 701, 713.)

■ That leaves only the difference of $40,582 between the Nattress Associates offer and the purchase price offered by Michels and Magnon. Under the Nattress Associates proposal, Sutherland would be required to pay the amount of the difference, $40,582, to C. Robert Nattress as a real estate commission, so Sutherland would receive the same net amount under the Michels/Magnon proposal as under the Nattress Associates offer. The question is whether the failure of the Michels/Magnon proposal to include the additional $40,582 caused their proposal not to be "on the same terms and conditions" offered by the Nattress Associates as was required by the right of first refusal (see fn. 1, *ante*). We conclude the proposal by Michels and Magnon to pay Sutherland the same net price he would have received under the Nattress Associates offer, which was accepted by Sutherland, was "on the same terms and conditions" offered by the Nattress Associates as that phrase was used in the lease provision granting the right of first refusal.

Perhaps the most persuasive consideration is the somewhat absurd result that would obtain otherwise: Michels and Magnon would have had to offer an additional $40,582 which would have gone not to Nattress but to Suth-

erland, so that in effect in order to meet the Nattress Associates offer, Michels and Magnon would have had to make an offer more favorable to Sutherland than that made by the Nattress Associates. No such result could have been intended by the drafters of the lease provision containing the right of first refusal.

Aside from that, we fail to perceive why the Nattress Associates should have any right to complain of Sutherland's acceptance of the Michels/Magnon proposal as an exercise of the right of first refusal when in net .effect the result to him from the two proposals was the same. The agreement for purchase and sale between Sutherland and the Nattress Associates was expressly made subject to Michels' right of first refusal of which the Nattress Associates were fully informed, and had Sutherland not recognized the Michels/Magnon proposal as an exercise of the right of first refusal, he would in all probability have faced a lawsuit by them for specific performance.

It appears to us that the only party who might conceivably have some basis for complaint would be C. Robert Nattress as an individual, who would have been entitled to a real estate commission of $40,582 had the Michels' right of first refusal not been exercised. An almost identical situation was before the court in *Hartmann* v. *Windsor Hotel Co.* (1949) 132 W.Va. 307 [52 S.E.2d 48], in which, under facts virtually identical to those in the case at bench, the real estate broker was suing the selling property owner for his broker's commission. The broker's theory was that in accepting the purported exercise of a right of first refusal which was less than the amount offered by the broker's prospective purchaser by an amount exactly equal to the commission, the owner had breached his contract with the broker. Approaching the matter semantically and rather literally, the court concluded that the amount offered under the right of first refusal was less than the amount offered by the broker's prospective purchaser, so the exercise of the right of first refusal was not on the same terms as the triggering offer and the owner was liable to the broker for payment of the commission. (*Id.*, 52 S.E.2d at pp. 51-52.)[2]

---

[2]A somewhat similar approach was utilized in *Coastal Bay Golf Club, Inc.* v. *Holbein* (Fla. 1970) 231 So.2d 854, where the purported exerciser of the right of first refusal was suing the owner for specific performance. In holding against the plaintiff, the court found a number of differences between the proposal purporting to exercise the right of first refusal and the triggering offer, one of which was the failure to include the amount represented by the real estate commission payable under the triggering offer but another of which was a difference of $42,000 less in interest to be paid the owner over a period of several years under the two proposals. (*Id.*, 231 So.2d at p. 858.) The fact that the owner of the property had *not* found the proposals equal and had *not* accepted the proposal purporting to exercise the right of first refusal was of great significance in the decision. The court stated in pertinent part: "The point is that Coastal's offer was a different offer. One who owns property has a

We are unable to subscribe to the somewhat mechanistic approach to the problem employed in the *Hartmann* decision. In the first place we doubt that the result yielded by that approach accords with the commercial realities or the expectations of the parties to a lease containing a right of first refusal such as that in the case at bench. On an objective basis the probable expectations of both the lessor and the lessee were that if the lessee made a proposal to exercise the right of first refusal which was exactly the same in net effect to the lessor as the triggering offer, the right of first refusal would be deemed exercised. If the literal matching of terms were required, a triggering offeror could by offering some unique consideration such as existing trust deed notes, a bag of diamonds or a herd of Arabian horses, effectively defeat the lessee's right of first refusal. How would the holder of the right of first refusal in such a case make an offer to exercise the right of first refusal on the same terms and conditions as in the triggering offer?

Moreover, when the only material difference between the triggering offer and the offer proposing to exercise the right of first refusal is the amount of the real estate commission payable under the triggering offer but not under the offer purporting to exercise the right of first refusal, the question of whether or not the exercising offer is on the same terms and conditions as were contained in the triggering offer should be determined on the basis of the reasonable expectations of the parties. Thus, the question in the *Hartmann* case should have been whether when the real estate broker and owner entered into the agreement calling for the payment of a commission to the broker, the parties contemplated the real estate broker would be entitled to payment of his commission if the holder of the right of first refusal made an offer that would yield the same net amount to the owner. Whatever the answer to that question might have been in *Hartmann,* it is quite clear the answer in the case at bench is that they did not. The contract for purchase and sale between Sutherland and Nattress Associates, including the provision for payment of a real estate commission to C. Robert Nattress, was made expressly subject to the right of first refusal held by Michels and plaintiffs have freely conceded throughout this case that the nonexercise of the right of first refusal was a condition precedent to the duty of Sutherland to sell the property to the Nattress Associates or its nominee or to pay

---

right to dispose of that property in any lawful way he chooses. In this case Coastal attempted to say to the sellers that the property must be disposed of in a particular way, i.e., without the payment of a commission and with the acceptance of a smaller cash payment than that proposed in Adler's offer. Since Coastal's offer required a disposition of the property by a different method and under different conditions than Adler's, it was not an unconditional acceptance of the right of first refusal and it did not match Adler's offer." (*Ibid.*)

Rather obviously, the fact that the owner in the *Coastal* case had *not* found the two proposals equivalent and had not accepted the purported exercise of the right of first refusal and the fact that the proposals purporting to exercise the right of first refusal differed in other material respects from the triggering offer distinguish that case from the case at bench.

C. Robert Nattress a real estate commission. As concluded earlier, it could not reasonably have been anticipated by any party that to meet the Nattress Associates offer would require an offer more favorable in net effect to the owner than the Nattress Associates offer itself.

We conclude the right of first refusal was effectively exercised by Michels and Magnon "on the same terms and conditions" set forth in the agreement between Sutherland and the plaintiffs as the quoted phrase was used in the lease provision containing the right of first refusal.

### Disposition

The judgment is reversed with directions to the trial court to enter judgment in favor of defendants.

Rickles, Acting P. J., and Cramer, J.,* concurred.

A petition for a rehearing was denied August 26, 1986, and respondents' petition for review by the Supreme Court was denied October 22, 1986.

*Assigned by the Chairperson of the Judicial Council.