[No. H007222. Sixth Dist. Dec. 16, 1991.]

STEVENS GROUP FUND IV, Plaintiff and Appellant, v.
SOBRATO DEVELOPMENT COMPANY, NO. 810 et al., Defendants and
Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the section titled "Cross-appeal."

888

COUNSEL

Alioto & Alioto, John I. Alioto and Michael J. Bettinger for Plaintiff and Appellant.

Bartko, Welsh, Tarrant & Miller, Richard T. Tarrant, Theani C. Louskos, Michael D. Abraham and Miriam D. Maxwell for Defendants and Appellants.

OPINION

AGLIANO, P. J.—Plaintiff the Stevens Group Fund IV, a general partnership, brought this action for breach of contract for the sale of real property against defendants Sobrato Development Company No. 810 et al.[1] The jury returned a verdict in favor of plaintiff, but awarded no damages, implicitly finding the fair market value of the property did not exceed the contract price. The trial court then denied plaintiff's request for specific performance. In subsequent proceedings, the court awarded plaintiff, as prevailing party, costs in the amount of $22,753.74 and attorney's fees in the amount of $300,000.

On appeal, plaintiff contends the trial court erred both in determining that Civil Code section 3306 did not authorize the recovery of lost rents as consequential damages and in denying its request for specific performance. Defendants cross-appeal, contending the real estate broker violated his duty to disclose his personal interest in the contract thus entitling defendants to judgment as a matter of law. They also contend the trial court erred: (1) in its interpretation of the contract; (2) in excluding extrinsic evidence of commercial real estate transaction custom and practice; (3) in ordering a partial directed verdict; (4) in granting summary judgment against defendants on their cross-complaint for rescission; (5) in awarding plaintiff attorney's fees and costs; and (6) in modifying its judgment.

---

[1] In addition to Sobrato Development Company No. 810, the defendants include John and Susan Sobrato 1979 Revocable Trust, Sobrato Interests, John A. Sobrato, John M. Sobrato, Susan Sobrato, Ann Russo, and Robert Granum II.

For reasons expressed below, we conclude that the judgment must be reversed and the matter remanded for a redetermination of plaintiff's request for specific performance.

*Statement of Facts*

In 1985, defendants offered for sale commercial real property located at 2334 Lundy Place, San Jose, California. As part of their marketing strategy, defendants prepared a brochure in which they offered to pay a 3 percent commission to any real estate broker who produced a buyer in a consummated sale. The brochure also described the existence and terms of a deed of trust securing a note in favor of Teachers Life Insurance Company (Teachers), including the fact that the note, which called for periodic payments, was not prepayable.

Plaintiff Stevens Group is a partnership of John Ziegler and David Dinerman. Ziegler owns 90 percent of the partnership while Dinerman owns 10 percent. Ziegler was also a licensed real estate agent and employee of Cushman & Wakefield which acted as the plaintiff's broker in the instant transaction. When plaintiff submitted its original purchase offer, Ziegler and Dinerman were aware that the existing loan was not prepayable. Ziegler acted as plaintiff's agent in the transaction but did not disclose he was a principal of plaintiff until litigation commenced.

On February 18, 1986, plaintiff and defendants entered into a contract for the sale of the property for the price of $13.1 million with the sale to close on June 1, 1986. Despite the fact the loan was not prepayable, the contract provided for conveyance of title "free and clear." After the contract was made, defendants asked Teachers to accept prepayment of the loan, but Teachers refused. Plaintiff, relying on the "free and clear" provision of the contract, refused to take title to the property subject to the Teachers loan. The stalemate unresolved, defendants failed to deliver the property as agreed. Plaintiff commenced litigation seeking alternative remedies of damages (Civ. Code, § 3306) and specific performance. (Civ. Code, § 3384 et seq.)

Additional facts will be included as they relate to the issues on the appeal and cross-appeal.

*Discussion*

*Appeal*

I. *Consequential Damages*

Plaintiff contends the trial court improperly precluded plaintiff's recovery of consequential damages pursuant to Civil Code section 3306. Plaintiff asserts the proper measure of damages in the instant case is the difference between the contract price and the fair market value of the property at the time of the breach plus consequential damages consisting of lost profits.

During *in limine* motions, plaintiff's counsel offered to prove through one Randy Sugarman that if plaintiff had acquired the property on June 1, 1986, and held it through an existing lease to ELXSI, plaintiff would have realized rental profits of $2,230,000.

Plaintiff also offered as evidence of lost profits the receipt of two offers to purchase the property: Roger Roelle of August Financial Corporation signed a letter of agreement on April 7, 1986, offering to purchase the property for $16.9 million and Frank Pipgras of Consolidated Capital Equities wrote a letter to plaintiff on April 13, 1986, offering to purchase the property for $17.2 million.

The trial court's tentative ruling was as follows: "[I]t's hard for me to see how any evidence which you concede would not be admissible through the mouth of an expert would be admissible through the mouth of a nonexpert. I just can't imagine that. I thought that 822 would preclude this altogether. [¶] My ruling is that you are not to introduce evidence of this or mention it in opening statement. I will hear the evidence by Mr. Ziegler and Mr. Dinerman, and, you know, if—without reference to this, and then if you want to explore this again—I don't think it's going to be admissible, but for the moment, my ruling is that it's not admissible, cannot be used as the basis for an opinion as to value, and I think that the expectation or hope of being able to wheel the property is a variant of value. So, that's my direction to you at this point."

During trial, plaintiff's counsel did not seek to introduce evidence of the two offers to purchase the property. However, counsel made a second offer of proof regarding an alternative method of computing damages. James Bradford (Brad) Paul, an appraiser, would testify that the fair market value of the property on April 1, 1986, was $15 million. David Dinerman would testify that it was $17,164,000. John Ziegler would testify that it was

$16,231,469. Plaintiff also sought to introduce evidence of additional damages in the form of lost rental income through the trial date in the amount of $1,672,307.14 and through the end of the lease in the amount of $2,050,365.06. In response, defendants argued that the capitalized income approach used by plaintiff's experts to determine the fair market value of the property on April 1, 1986, already credited the amount of rents which would have been collected by the owner of the property. The trial court denied plaintiff's request to introduce evidence of rents as an item of consequential damages, stating, "it does appear clear that when you use those rents for the purpose of establishing a value and then use those rents again on top, it does appear clear that you're doubling up that. This isn't simply, you know, the consequence of the breach because that's already taken into account."

At trial, David Dinerman testified that the property was worth approximately $15,164,000 as of April 1, 1986. His opinion was based in part on the capitalization of income method. This method determines the value of a property on the income it generates. Dinerman estimated the net cash flow over the term of the ELXSI lease in order to determine its fair market value. Using the cost, comparable sales and income capitalization approaches, plaintiff's expert James Paul, a real estate appraiser, testified the property was worth $15 million as of April 1, 1986. The value of the property was $15,650,000 under the cost approach, $15 million under the comparable sales approach, and $15 million under the income capitalization approach. The cost approach included "an entrepreneurial profit in order to provide an incentive for a developer to build a property of this type." Both the comparable sales and the income capitalization approaches took into account the income generated by a property.[2]

During a discussion of jury instructions, plaintiff's counsel stated: "I would like to memorialize for the record that the plaintiff once again has asked for, as consequential damages, lost rent in the meantime, as an alternative to the difference between the market price and the contract price at the time of the breach. In other words, we believe that the jury instruction on that should be. You're entitled to the difference between the market price and the contract price at the time of breach. Or, the plaintiff would be entitled to lost rent which he did not collect in the meantime. And I want to note for the record that that instruction was rejected, and plaintiff takes exception to it."

---

[2] On appeal, plaintiff also relies on testimony by Ziegler that the net operating income of the property under the ELXSI lease, guaranteed for another four and one-half years, was between $400,000 and $500,000 per year. However, this evidence was not admitted to prove value of the property.

Civil Code section 3306 (section 3306) provides as follows: "The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed at the time of the breach, the expenses properly incurred in preparing to enter upon the land, consequential damages according to proof, and interest."

In 1983, section 3306 was amended. The summary of Assembly Bill No. 1068 explained the amendment as follows: "Under existing law, the detriment caused by a breach of an agreement to convey real property is the price paid, expenses incurred, interest, and, in the case of bad faith, the difference between the agreed price and the value of the property plus expenses incurred in preparing to enter upon the land. [¶] This bill would delete the requirement of bad faith for recovery of the difference between the agreed price and the value of the property plus expenses in preparing to enter upon the land, and would also permit the recovery of other consequential damages and interest, as specified."

The Assembly Committee on Judiciary explained the inclusion of consequential damages in the proposed statute. "This bill would permit the recovery of 'consequential damages' for breach of a real property conveyance agreement. Generally, such damages are those which, in view of all facts known by the parties at the time of the making of the contract, may reasonably be supposed to have been considered as a likely consequence of a breach in the ordinary course of events. This provision would conform the measure of damages in real property conveyance breaches to the general contract measure of damages which is specified in Civil Code 3300: '. . . all the detriment proximately caused (by the breach), or which, in the ordinary course of things, would be likely to result therefrom.' "

■ Thus, section 3306 provides that the measure of damages for plaintiff is the difference between the contract price and the fair market value of the property at the time of the breach plus consequential damages. Rents received from the lease of the property in this case are not properly an item of consequential damages. Here, plaintiff introduced evidence as to the fair market value of the property which included these profits. To allow these as consequential damages under these circumstances would have permitted a double recovery for plaintiff.

An appraiser's opinion as to the value of a particular parcel of property is based on a variety of factors. "Each of the three methods—market data, cost

and capitalization, will give different figures. It is at this point that the expertise of the appraiser is most important. The true value of the property is not found by averaging these figures. He must bring his training and experience to bear in order to determine a final, accurate estimate of the value of the property." (Fns. omitted.) (4 Augustine & Zarrow, Cal. Real Estate Law & Practice, § 101.47(1).) Here, plaintiff's appraiser valued the property at $15 million by considering the cost, comparable sales and income capitalization approaches. An instruction on consequential damages based on rental income would have been erroneous.

Alternatively, plaintiff contends it was entitled to either the difference between the contract price and fair market value or consequential damages. The language of the statute is clear. It does not provide for alternative measures of damages.

## II. *Specific Performance*

Plaintiff contends the trial court erred in denying specific performance.

Prior to trial, two issues relevant to specific performance were adjudicated pursuant to a motion for summary adjudication of issues. The court found as follows: "1. Teachers Insurance and Annuity Association ('Teachers') had the right to refuse prepayment of its loan ('Teacher's Loan') with Sobrato Development Company Number 810 under the terms of said loan. [¶] 2. Sobrato Development Company Number 810 was unable to arrange for the prepayment of the Teacher's Loan and the removal of the deed of trust securing the Teacher's Loan because Teachers refused to allow prepayment and had the right to do so under the terms of the Teacher's Loan."

Evidence at trial, however, disclosed that the Teachers loan was due and capable of being paid in 1989 and therefore defendants were able to convey title to the property free and clear as required by the contract, at the time of trial. Plaintiff contends it was entitled to a decree of specific performance because the impediment to defendant's performance had been removed.

The trial court denied specific performance on the ground that defendants had been unable to convey the property free and clear at the time of sale. The court stated: "The question then becomes whether or not an agreement to perform an act which a party has the power to perform, at the time the Court is asked to enter its decree, is specifically enforceable, when the party could not have performed at the time the contract was entered into or at the time that performance under the terms of the contract was due. . . . [¶] Even

though the appropriate time for determining certain types of specific enforcement issues, such as mutuality is at the time enforcement is sought and not the time of its execution, it would appear that in the present case the inability to obtain clear title at the time of the anticipatory repudiation prevents the Court from issuing a decree of specific performance even though the contract could be performed now. The Plaintiffs never sought partial performance nor any transfer of less than clear title. [¶] It should be observed that the summary adjudication did not amount to a determination of legal impossiblity that would provide a defense to the breach but rather such that prohibits specific performance. The remedy then was the action for damages which has concluded." In its subsequent memorandum of decision relating to the issue of attorney's fees, the court clarified, "The Court, in equity, did not order specific performance, but *only* because the Court was bound by prior determinations in summary judgment orders that meant that a third party [Teachers] would have been detrimentally affected."

Civil Code section 3390 provides in relevant part: "The following obligations cannot be specifically enforced: [¶] . . . [¶] 3. An agreement to perform an act which the party has not power lawfully to perform when required to do so . . . ."

No case has been cited, nor have we found one, which applies this statute to facts like those before us. ■ However, as one commentator has noted, "[t]he general doctrine is well established, and from the very nature of the case it could not be otherwise that the absolute inability of the defendant to perform his undertaking at all, when called upon by the court to do so, prevents a decree against him for its specific enforcement. . . . *It is not enough that the defendant's incapacity exists at the time of making the contract; it must also exist at the hearing; for if a person agrees to do a certain act which he is then unable to do, but he afterwards becomes clothed with the power, he will be compelled to perform*—if the contract is not illegal—for he will not be allowed to say that he did not intend to acquire the interest, or estate, or other means necessary for the fulfillment of his engagement." (Pomeroy, Specific Performance of Contracts, (3d ed. 1926) § 293, pp. 661-662, italics added.)

In *Farnum* v. *Clarke* (1906) 148 Cal. 610 [84 P. 166], the plaintiffs contracted to purchase government lands from the defendant. The defendant was the equitable owner of the lands but had not yet acquired legal title because he had not received final approval from the government. (*Id.* at pp. 612-613.) The defendant contended the plaintiff was not entitled to specific performance, because he did not have legal title and thus the power to

lawfully convey the lands as required by Civil Code section 3390, subdivision 4. (*Id.* at p. 618.)[3] The court noted that where a seller has a lesser interest or a less perfect title in real property than that which he has contracted to convey, a buyer may enforce the contract as to whatever interest the seller possesses. (*Ibid.*) "It is not necessary, in order to sustain the right to a specific performance, that *at the time such performance is sought to be compelled* the vendor should have a complete equitable or legal title to the land which he contracted to convey." (*Id.* at p. 617, italics added.) Thus, the court focused on whatever interest the seller would possess at the time the decree would issue.

In *Milkes* v. *Smith* (1949) 91 Cal.App.2d 79 [204 P.2d 419], the plaintiff sought specific performance of a real estate sale contract. The defendant, however, did not possess the entire fee, but was only a tenant in common. (*Id.* at p. 80.) The court held the plaintiff was entitled to specific performance to the extent of the defendant's interest in the property and compensation for the interest which he did not receive. The court stated as follows: " 'In actions by a vendee for the specific performance of a contract for the sale of real estate, where it appears that the vendor is unable to make a complete or perfect title, or that there is a deficiency in the quantity of land contracted to be sold the general rule is that the vendee, if he so elects, is not only entitled to have the contract specifically performed to the extent of the vendor's ability to comply therewith by requiring him to give the best title he can or convey what he has, but he may compel the vendor to convey his defective title or deficient estate, and at the same time have a just abatement out of the purchase price for the deficiency of title, quantity, or quality of the estate to compensate for the vendor's failure to perform the contract in full.' " (*Id.* at p. 82, quoting 49 Am.Jur. § 105, p. 123.) In this statement, the court is focusing on the extent of the defendant's ability to perform lawfully at the time the plaintiff elects his remedy, not necessarily at the time of performance under the contract.

In *Farnum* and *Milkes*, the plaintiffs were willing to take whatever interest in the real property the defendants possessed. ■ Defendants attempt to distinguish *Farnum* and *Milkes* from the instant case on the ground that plaintiff here did not request conveyance of the property subject to the Teachers loan. Assuming, however, that plaintiff had sought specific performance on such terms, plaintiff would have been entitled to the property and the difference between the loan payments under the Teachers loan and plaintiff's alternative loan commitment. "A contrary rule would permit a defaulting party to preclude any intervention by a court of equity merely by

---

[3]Subdivision 4 of Civil Code section 3390 has been renumbered as 3.

refusing to perform as he had agreed." (*Lowry* v. *McCaffrey* (1949) 90 Cal.App.2d 188, 190 [202 P.2d 600].)

In another context, the court in *Hansen* v. *Hevener* (1924) 69 Cal.App. 337 [231 P. 361], stated a plaintiff could bring an action for specific performance although the defendant could not have performed at the time of the contract. There the court upheld an award of damages rather than specific performance after the seller, in bad faith, had prevented performance. The seller did not have title to the real property at the time of the contract. (*Id.* at pp. 340-341.) "It is apparent in the instant case that while it is shown by the complaint that at the time the action was commenced plaintiff knew that defendants could not specifically perform, it did not appear but that defendants might procure title to the property before the action was determined." (*Id* at. p. 345.)

The cases upon which defendants rely do not support their position. In *Lansburgh* v. *Market Street Ry. Co.* (1950) 98 Cal.App.2d 426 [220 P.2d 423, 21 A.L.R.2d 785], the buyer terminated a contract for the sale of real property on the ground that the seller was unable to convey clear title. (*Id.* at p. 428.) The buyer contended that the city's preliminary steps toward condemnation proceedings rendered the seller's title unmarketable. Three months after the action was filed, the city began condemnation proceedings. The court held the city's actions had no legal effect on the property owner's rights at the time for performance under the contract, thus the seller's title was not defective and the buyer breached the contract. *Lansburgh* did not involve a buyer's request for specific performance.

At issue in *Fogarty* v. *Saathoff* (1982) 128 Cal.App.3d 780 [180 Cal.Rptr. 484], was whether the seller's failure to obtain a termite report was an anticipatory breach of the contract to sell real property. There was no issue relating to Civil Code section 3390.

In *Ward* v. *Downey* (1950) 95 Cal.App.2d 680, 683-684 [213 P.2d 523], the court held the sellers were not entitled to specific performance where they had failed to supply the necessary documentation to allow the title company to issue a title policy until seven days after the time fixed for closing.

*Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 539-540 [63 Cal.Rptr. 518], and *C. Robert Nattress & Associates* v. *CIDCO* (1986) 184 Cal.App.3d 55, 64-65 [229 Cal.Rptr. 33], stand for the proposition that a buyer seeking specific performance must prove he was able to perform at the time of the contract and during the prosecution of the action. No issue has been raised here as to plaintiff's ability to perform its obligations under the contract.

 Defendants' reliance on Civil Code section 3390, subdivision 4, is also misplaced. Section 3390, subdivision 4, bars a decree of specific performance of "[a]n agreement to procure the act or consent of . . . any other third person." However, the issue of consent by a third party was not involved at the time a decree for specific performance would have issued in the instant case.

Permitting the trial court to consider the seller's ability to perform at the time of the decree provides the court with greater latitude in exercising its equitable power to order specific performance when appropriate. Such construction of Civil Code section 3390 provides greater assurance that a contract is performed. However, we do not intend to suggest that the trial court should order specific performance in this case. That decision is still for the trial court which may well decide, after considering all applicable criteria, that equity warrants denial. (*Mills* v. *Skaggs* (1944) 64 Cal.App.2d 656, 660 [149 P.2d 204].) Accordingly, we remand the matter to the trial court to consider all relevant factors and determine whether plaintiff's request for specific performance should be granted.

### Cross-appeal*

. . . . . . . . . . . . . . . . . . . . . .

### Disposition

The judgment is reversed and the matter remanded to the trial court for further hearing on the issue of specific performance in a manner consistent with this opinion. The parties are to bear their own attorney fees and costs on this appeal.

Cottle, J., and Elia, J., concurred.

The petition of appellant Stevens Group Fund IV for review by the Supreme Court was denied March 25, 1992.

---

*See footnote, *ante*, page 886.