[Nos. A123670, A124882. First Dist., Div. Two. Dec. 2, 2010.]

GREENWICH S.F., LLC, Plaintiff and Respondent, v.
DONNA WONG, Defendant and Appellant.

742

Counsel

Wendel, Rosen, Black & Dean, Les A. Hausrath and Thiele R. Dunaway for Defendant and Appellant.

Law Office of John Derrick and John Derrick for Plaintiff and Respondent.

Opinion

KLINE, P. J.—

## INTRODUCTION

The primary questions presented in this case are whether lost profits may be awarded as consequential damages under Civil Code section 3306 for breach of a real property sale agreement where the buyer intended to renovate and sell the property at a profit and, if so, whether lost profits were properly awarded here.[1] We shall conclude that although lost profits may be available in an appropriate case, lost profits were not properly awarded here, where the evidence showed the prospect of profits was uncertain, hypothetical and entirely speculative.

Defendant Donna Wong appeals from a judgment of the San Francisco Superior Court on a jury verdict awarding plaintiff and respondent Greenwich S.F., LLC (Greenwich S.F.), $600,000 in lost profits, among other damages, on appellant's breach of a real property sales agreement between appellant and plaintiff Yui Hei Chan, Greenwich S.F.'s predecessor in interest.[2] Appellant contends the trial court applied an erroneous measure of damages by allowing recovery of lost profits as consequential damages under section 3306. She also contends the court erred (1) in admitting expert testimony as to the hypothetical value of the property if it had been renovated according to plaintiffs' plans; (2) in allowing the expert to testify as to new opinions regarding valuation dates to which the expert did not testify during her deposition; and (3) in instructing the jury that it could award lost profits. If lost profits may be recovered in an appropriate case, appellant contends the evidence was insufficient to support the award in this case as (4) lost profits were not proved with reasonable certainty and the prospect of profits after renovation was hypothetical and speculative, and (5) there was insufficient evidence to support a finding that appellant knew plaintiffs intended to sell

[1] All statutory references are to the Civil Code, unless otherwise indicated.

[2] Chan and Greenwich S.F. will be referred to collectively as plaintiffs (but see fn. 5, *post*, at p. 747). Greenwich S.F. is the sole respondent on appeal.

the property for a profit. Appellant also challenges (6) the award of $60,000 in damages for sums plaintiffs had deposited into escrow, and (7) the award of $90,000 in damages for funds plaintiffs expended toward the planned property renovation. Finally, should she prevail on appeal, appellant seeks reversal of the attorney fee award.

## FACTS AND PROCEDURAL BACKGROUND

Appellant and her late husband Dennis Wong (Wong) were married for 44 years. The couple owned many investment properties together. Wong made decisions regarding the purchase of the properties; however, appellant did the bookkeeping, collected rents and paid the expenses. Yui Hei Chan was a licensed general contractor and had been involved in both remodeling and building houses. Chan and Wong had known each other for a long time. Chan called Wong his "uncle." In 2001, Wong and Chan began doing business together, Wong buying houses and Chan remodeling them. Specifically, in 2001, Wong and a friend purchased a house on 28th Avenue. Chan remodeled the house, working on it for four or five months. Wong and Chan signed a contract wherein Chan was responsible for remodel plans, remodeling the house, and selling it. He made "commissions" from the remodeling, but could not remember how much. He stated it was "several tens of thousands of dollars." Chan worked with Wong remodeling an apartment building owned by Wong, repairing the roofs on three structures. He was not paid for that work, but deducted $18,000 from a $50,000 debt on money he had borrowed from Wong in 2002. He repaid the balance of the debt, plus interest to appellant in 2003, after Wong's death.

In 2002, Chan became aware of the subject property, located on Greenwich Street in San Francisco. It was a very old, damaged, and unoccupied residence. Chan contacted Wong and the two orally agreed that Wong would buy the property and Chan would remodel or rebuild it. Upon resale, Chan would receive 20 percent of the profit. Wong purchased the property for $711,000, taking title with appellant as "joint tenants." Chan did not tell appellant about his 20 percent profit on resale of the property. He did not discuss the property with appellant before Wong's death. However, Chan testified that appellant was present on one occasion when Wong told Chan that "we would be making money for sure and you would be making money, so she knew." Appellant told Chan, "He is so old now. He is still concerning making money for you."

Wong died suddenly on December 27, 2002, three months after purchasing the Greenwich Street property. During the three-month period, Chan had been working with an architect, James Li, on a design for the property. However the plans had not been drawn up before Wong's death. Chan anticipated that

after the plans were drawn, it would take approximately one year after plan approval by the City of San Francisco to complete the building. He had originally expected under his oral agreement with Wong that it would take more than two years from the date the property was purchased to complete the project.

About a month after Wong's death, Chan heard from a realtor that appellant wanted to sell the Greenwich Street property. Of the properties that appellant was left owning, the Greenwich Street property was the only one (with the exception of her home) not producing income. The property needed major redevelopment, but appellant had no experience of the sort that would be required and, so far as her son Dexter Wong knew, she had no plan to develop it herself. Appellant called Chan a week later asking him to find a buyer. Chan tried, but was unable to find a buyer, because they thought the price was too high.

According to appellant, around this time Chan proposed to her that he would fix up the property for her, then sell it, and they would split the profit half and half. Chan denied this conversation. However, he told appellant that he had already spent $10,000 to $20,000 in his time and money on the project based on his oral agreement with Wong.

Chan testified that, pursuant to his oral agreement with Wong, he was to be paid for his work on the property as a contractor, plus 20 percent of the profits realized on resale. Asked how much he expected to make "as a contractor" on the project, he testified that the calculation would be based on the square footage of the construction and that "[u]sually is $160 to $180 per square foot." That square footage would be "[w]hatever the City Hall approves in the plans." He reiterated that he could not give a "best estimate" as to his expected earnings on the agreement with Wong because "[i]t all depends on what size the City approves. If the City approves 300 square foot, then it would be that, or 3,000 square foot, it would be that, or 4,000 square foot. Whatever." He also stated, "the bigger the better, but it all depends on the approval from the City." His agreement with Wong anticipated construction of a new two-unit building on the site. Li eventually drew up plans for a two-unit structure to replace the existing house. Although Chan did not remember the total square footage for those plans, he stated he "would approximate it to be 4,000 square foot." Questioned again as to his "best estimate" of what he expected his 20 percent profit to amount to after renovation and resale of the property, Chan again said, "It is useless to approximate because it all depends when you sell the structure." Asked to assume that the construction was completed and sold in the fall of 2004, Chan stated that one year did not include the time needed for the city to approve plans to get the permit and that he had expected the project to be

completed and ready for resale "more than two years" after purchasing the property—"more or less" sometime in 2005. Asked to assume the property was ready for resale in the summer of 2005, Chan again could not estimate what 20 percent of the profits he expected to earn would total. He responded, "[y]ou [would] have to ask Uncle Wong because he paid for all the expenses, so I would not know." Asked again, he stated, "I don't know." Asked whether he expected to earn more than $200,000, he answered that he "did not think of that question at all."

Chan decided to try to find others to purchase the property with him. He contacted John Lee, a CPA (certified public accountant), and someone with whom he had bought and sold houses previously. Lee testified that he "did business with Chan for many, many properties." Chan's role was to perform multiple functions as a finder of the property, as a contractor, and developer. Chan testified that as of 2003, he had worked on three renovation projects with John Lee for a percentage of the profits on the renovated properties.

Chan testified that on the first renovation project he undertook with Lee, he received 10 percent of the profit. Asked "[h]ow much was that [10] percent? How much did it amount to?" Lee answered, "$160,000. Sorry. No. $1,600,000."[3] Chan testified that he and Lee sold the second project, but did not make any profit. His percentage of the third project with Lee was also 10 percent, but once again he made nothing. Chan testified that before offering to purchase the Greenwich Street property he and Lee had a conversation about the possibility of potential renovations, but they did not discuss much. Chan stated that "[g]enerally we buy a property and then we discuss what to do about it."

Lee proposed to buy the Greenwich Street property for $760,000. That was the price appellant was hoping to get. Lee contacted two other investors, Elizabeth Tsai and Eddy Shum, with whom Li and Chan formed a limited liability company, respondent Greenwich S.F., for the purpose of acquiring, developing, and reselling the property. Chan held about 10 percent and the other three each held about 30 percent of the company.[4] In May or June of 2003, Chan told appellant that he had a buyer for the property for the

---

[3] Chan was testifying in Cantonese and there were translation issues during the trial. A reasonable inference favorable to Greenwich S.F. from this testimony is that the first project made a $1.6 million profit and Chan's 10 percent share was $160,000. (It is not reasonable to assume that Chan's 10 percent profit on this first house renovation project was $1.6 million—requiring a $16 million profit on the renovation project.)

[4] Lee testified that as to the Greenwich Street property, in addition to being paid as the contractor for his various expenses associated with the contracting services he provided, Chan was to be paid 14.5 percent on all the profits, even though he contributed only 10 percent of the capital. The extra 4.5 percent was for Chan's actions as developer, contractor, finder and coordinator.

$760,000 price. A realtor prepared the purchase agreement and Chan signed it on July 25, 2003. The buyer in the contract was named as "Yui Hei Chan And Assignees." Chan later executed a complete assignment of all of his rights and obligations under the contract to Greenwich S.F.[5]

Appellant signed and dated the contract in her home on July 30, 2003, in the presence of her son Dexter, himself a real estate broker. The parties had widely varying versions of the events leading to and following appellant's signing of the purchase and sales agreement. However, on this appeal, we recite the facts in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642 & fn. 3 [11 Cal.Rptr.3d 807]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 8:74, p. 8-35 (rev. # 1, 2009).)

Chan took the contract to Lee, who wrote a check for $60,000 so that escrow could be opened. Lee testified he expected escrow to close within a matter of days. Chan expected escrow to close within about 30 days.

Chan worked on obtaining the various approvals and permits for the work on redeveloping the property. Lee was not happy with the two-unit duplex concept that had been worked on thus far. Therefore, the project changed from a two-unit building to a single-family residence and architect Li was engaged to begin redrawing the plans anew. These plans were revised several times: on March 30, 2004, July 9, 2004, and April 15, 2005. The eventual design was for a single-family residence of approximately 4,000 square feet.

In September of 2003, appellant told Chan that tax issues had arisen with her husband's estate and would delay closing of escrow on the property. Chan received a letter dated March 30, 2004, from an attorney representing appellant, implying that Chan was cheating appellant and demanding that the escrow be cancelled. The letter stated that the Greenwich Street property was in probate and that the escrow had to be cancelled. The letter was headed: "Notice of Rescission of Contract." (The probate had been opened in Sept. 2003, after appellant and Chan signed the contract. Appellant and Wong had held title in joint tenancy, so the property should never have been in the probate estate.) Chan spoke with Lee, who urged him to speak with appellant. Appellant asked Chan to cancel the escrow to allow the probate to proceed and assured him that after the probate was concluded, she would still sell the property to him. Chan told her that he and his partners were spending a lot of

---

[5] At trial the parties stipulated that the assignment was valid. Therefore Chan individually was no longer a real party in interest. However, he remained a member of Greenwich S.F. and was referred to as a "plaintiff" throughout the litigation and verdict.

time and money getting permits and told her of the preparations being made for the redevelopment of the property. Lee also met with appellant in April 2004, and she agreed to reopen the escrow or open a new escrow once issues in probate were resolved. Therefore, appellant and Chan signed escrow cancellation instructions on April 28, 2004. Chan and Lee testified they never agreed to rescind the contract itself and appellant never suggested they do so.

Thereafter, appellant assisted Chan in posting notices required by the city to inform neighbors who might have objections to the project. A number of neighbors raised objections to the project. However, after meeting with Chan and architect Li about the proposed renovations, the neighbors' objections were withdrawn. A permit was obtained sometime in 2005, but the permit fee was never paid.

At some point after the permit was approved in 2005, Chan asked appellant when she would transfer title so that plaintiffs could proceed. Appellant said the price had gone up, that the property was worth more than $1 million. She wanted $1.1 million for the property. She also maintained, including at trial, that she lacked the ability to transfer the property because it was in probate.

Plaintiffs Greenwich S.F. and Chan filed their action for breach of contract on July 28, 2006. The third amended complaint alleged a cause of action for breach of contract, together with other causes of action. Appellant raised various affirmative defenses and cross-complained against plaintiffs.

The case was tried to a jury in August and September 2008. At trial, plaintiffs presented evidence of their damages due to appellant's breach of contract.

Lee testified on direct examination about out-of-pocket expenditures that Greenwich S.F. made from 2003 to 2005 as a result of the contract to purchase and develop the property: In 2003, Greenwich S.F. paid Li $10,000 for design work; paid $2,000 in attorney fees to form the limited liability company; paid an $800 minimum annual tax payment to the state; and paid $2,547.74 to the City and County of San Francisco for planning and related costs. In 2004, Greenwich S.F. paid Li $26,000 more for his architectural design services on the project; paid $412.42 to the San Francisco Planning Department; paid $117 for compilation of a list of people in the neighborhood required to be noticed of the planned construction; and paid $2,500 for a soils report as part of the permit requirements. In 2005, Greenwich S.F. paid

$2,366.72 to the San Francisco Unified School District as part of the permit process, and $30,000 to a permit facilitator. (Lee testified it was almost impossible to get a permit approved in San Francisco without a facilitator.) In addition, the court admitted into evidence a handwritten itemization prepared by Lee. This itemization contained 12 entries, totaling $90,165.30. Most were referenced by Lee in his testimony. The itemization included a notation of "minimum tax LLC" of $4,800 (rather than the $800 to which Lee had testified); $2,547.74 to the City and County of San Francisco and $112.42 to the city Planning Department (rather than the single payment of $412.42 to which Lee had testified); $170 to the person compiling the list of neighbors (rather than $117); an additional $112.42 to Li for his revised plan; and $9,556 to Chan for travel costs.

Greenwich S.F. presented evidence of lost profits through the testimony of real estate appraiser Janette Miller. She had inspected the property in April of 2008, and had seen the plans and specifications prepared by Li for the project. Based on her review of a "drive by" or "desktop" appraisal done for appellant before the sale by John Tom in 2002, that valued the property at $850,000, Miller opined that the value of the property in December 2002 was $878,000. Miller also testified she had appraised the property in April 2008, some months before trial, at $1,009,000 in its undeveloped state (the "as is" appraisal). Miller acknowledged that her April 4, 2008 "as is" appraisal misstated the neighborhood boundaries and that it erred in listing the zoning compliance as "legal." In fact, the lot was substandard and the property would be a legal nonconforming use. She maintained it was likely the developer would be able to build a house on the property, but that "there might be a few more hoops for them to jump through." Miller also opined that if the property could be built according to the plans and specifications that had been generated by Li and with no changes (the "plans and specs" appraisal), the value of the property would have been $3,252,000 as of April 4, 2008. Appellant's expert real estate appraiser Stanley Joel Tish criticized Miller's appraisals (and particularly the "plans and specs" appraisal) on numerous grounds and concluded that the "plans and specs" appraisal was not in conformity with minimal appraisal standards of the Uniform Standards of Professional Appraisal Practice and did not constitute a market value appraisal. Tish also opined that the reports indicated nothing about the financial viability of the proposed project. He did not opine on the market value of the property.

At the close of trial, both parties moved for directed verdicts. The trial court ruled Chan had no causes of action remaining following the assignment of his interest to Greenwich S.F.

The jury returned its verdict, finding there had been a contract between the parties and that appellant had breached it.[6] It made the following findings as to damages: The difference between the fair market value of the property on the date of the breach and the contract price was $0. The amount of payments made by plaintiffs toward the purchase was $60,000. The amount of any reasonable expenses for examining title and preparing documents for sale was $0. The amount of reasonable expenses in preparing to occupy the property was $0. The amount of reasonable consequential damages for lost profits was $600,000, and the amount of reasonable consequential damages for expenditures incurred by plaintiffs in planning to develop the property was $90,000.[7] Judgment was entered on October 6, 2008.[8] Appellant filed a timely appeal from the judgment (case No. A123670).

On January 27, 2009, the court awarded $391,000 in attorney fees to plaintiffs. Appellant timely appealed the attorney fee award (case No. A124882). We consolidated the two appeals.

## DISCUSSION

### I. Lost Profits Under Section 3306

The parties agree that the proper measure of damages in this case is that set forth in section 3306, which provides: "The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred in examining the title and preparing the necessary papers, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed at the time of the breach, the expenses properly incurred in preparing to enter upon the land, *consequential damages according to proof*, and interest." (Italics added.)

---

[6] The jury also found in favor of plaintiffs on claims for breach of the covenant of good faith and fair dealing and anticipatory breach, as well as in favor of plaintiffs on appellant's affirmative defenses of unilateral mistake, undue influence, fraud and negligent misrepresentation. It found in favor of plaintiffs on appellant's rescission cause of action. The jury found in favor of appellant on plaintiffs' claim for unjust enrichment.

[7] The parties agreed that although the special verdicts did not describe the two awards of consequential damages in terms of lost profits and expenses toward the planned renovation of the property, the $600,000 was for lost profits and the $90,000 was for funds expended toward the planned renovation of the property. This is consistent with the jury's labeling these damages as "A" and "C" in the manner suggested by the instructions given by the court.

[8] Despite the parties' stipulation as to the validity of Chan's assignment of the purchase agreement to Greenwich S.F., and the court's order dismissing Chan as a party, the judgment entered named Chan as a prevailing party along with Greenwich S.F. This appears to be an obvious clerical error that we may correct here by modifying the judgment. (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1308–1309 [92 Cal.Rptr.2d 418]; *Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 506 [227 Cal.Rptr. 318].)

The parties disagree as to whether consequential damages under section 3306 may include lost profits. The issue is one of law, subject to our de novo review on appeal. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 315 [96 Cal.Rptr.2d 747, 1 P.3d 63] [measure of damages for promissory estoppel is a question of law]; *Glendale Redevelopment Agency v. County of Los Angeles* (2010) 184 Cal.App.4th 1388, 1396 [109 Cal.Rptr.3d 815] [de novo review of questions of statutory interpretation].) "The rules of damages for a breach of a contract to sell or buy real property are special and unique. To the extent that the measure of compensatory damages available to a buyer or seller of real property for a breach of a contract are different from the general measure of compensatory damages for a breach of contract, the special provisions for damages for a breach of a real property sales contract prevail." (12 Miller & Starr, Cal. Real Estate (3d ed. 2008) § 34:42, p. 34-158 (rel. 9/2008), citing Code Civ. Proc., § 1859; see *Crag Lumber Co. v. Crofoot* (1956) 144 Cal.App.2d 755, 777–780 [301 P.2d 952].)

No California case cited by the parties or found by us directly holds that lost profits are encompassed within the "consequential damages" recoverable by the parties under section 3306. Various treatises appear to differ on the question whether lost profits ever may be recovered as consequential damages. (Compare 12 Miller & Starr, Cal. Real Estate, *supra*, § 34:45, pp. 34-160 to 34-161 (rel. 9/2008) [indicating lost profits may be available where the "buyer purchased the property for purposes of resale and the seller was aware of the buyer's purpose"] with Cal. Real Property Remedies and Damages (Cont.Ed.Bar 2d ed. Aug. 2010 update) § 4.46, p. 321 [lost resale profits not available] and 54 Cal.Jur.3d (2008) Real Estate, § 563, p. 744 [lost profits are "generally not an allowable measure of recovery"]; see also Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2009) ¶ 11:192, p. 11-47 (rev. # 1, 2009) [stating both that lost profits are not recoverable consequential damages under § 3306, and that "[u]nless the buyer purchased the property for resale and the seller was aware of the buyer's intention to resell the property, lost profits are not deemed a reasonably foreseeable, natural consequence of the seller's breach of its obligation to convey"].)[9]

---

[9] Miller and Starr indicate that lost profits are available as consequential damages under certain circumstances, stating, "[t]he buyer cannot recover damages for the amount of lost profits which would have been realized if the seller had conveyed the property as required by the contract *unless the buyer purchased the property for purposes of resale and the seller was aware of the buyer's purpose.*" (12 Miller & Starr, Cal. Real Estate, *supra*, § 34:45, pp. 34-160 to 34-161 (rel. 9/2008), italics added, fns. omitted.)

The California Continuing Education of the Bar treatise indicates that lost profits are not allowed under the statute. "Under [section] 3306, the buyer is limited to the difference at the time of the breach regardless of market conditions. [Citations.]" (Cal. Real Property Remedies and Damages, *supra*, § 4.46, p. 321.) Citing to *Horning v. Shilberg* (2005) 130

Historically, the measure of damages under section 3306 for a seller's breach of a contract to sell real property has been held not to include lost profits. (E.g., *Coger v. Wiltsey, supra,* 117 Cal.App. at pp. 657–658.) The appellate court in *Coger v. Wiltsey* reversed a judgment awarding lost profits for breach of an agreement to convey real property where the jury was instructed in terms of section 3300, rather than 3306. The appellate court reasoned that to allow the recovery of lost profits in this context "would open the door to fraud and collusion. One would merely have to plead and prove a contract with a third party, and he thereupon would be entitled to judgment for the difference between the original contract price and the contract price with the third party. This would be done, as attempted here under the guise of special damages. This would open up a realm of speculation for the jury. It was probably for this reason that the legislature confined the damages to the difference between the price agreed upon in the contract and the value of the land at the time of the breach. . . . [W]here a vendor has breached his contract to convey real property, the vendee cannot recover damages predicated . . . solely upon profits which he might have made on a resale of said property to a third party." (117 Cal.App. at pp. 657–658.)[10]

Cal.App.4th 197 [29 Cal.Rptr.3d 717], this treatise describes the case holding as, "lost resale profits not allowed under [section] 3306, and plaintiff's failure to produce evidence of value of property on date of breach precluded damages under [section] 3306." (Cal. Real Property Remedies and Damages, *supra,* § 4.46, p. 321.)

California Jurisprudence Third, relying upon *Horning v. Shilberg, supra,* 130 Cal.App.4th 197, and cases predating the 1983 amendment to section 3306 to add consequential damages, states: "Loss of profits is generally not an allowable measure of recovery, and a judgment awarding damages for the breach of an agreement to convey real property based on the profit the purchaser could have made on a resale is not based on an allowable measure of recovery. Despite a breach of a real estate sales agreement, the statute governing damages flowing from a breach of such agreement does not authorize an award of damages to a purchaser based on the resale profits enjoyed by a vendor; under the statute, the measure of damages is the difference between the purchase price and the fair market value of the property on the date of the breach. [(*Horning v. Shilberg, supra,* 130 Cal.App.4th 197.)]" (54 Cal.Jur.3d, *supra,* Real Estate, § 563, p. 744, fns. omitted.)

"The buyer's lost profits generally are *not* recoverable consequential damages under [section] 3306 (although such damages may be recoverable under a *fraud* cause of action . . . ; *or* as incidental compensation pursuant to a decree of specific performance . . .). Unless the buyer purchased the property for resale and the seller was aware of the buyer's intention to resell the property, lost profits are not deemed a reasonably foreseeable, natural consequence of the seller's breach of its obligation to convey. [Citations.]" (Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions, *supra,* ¶ 11:192, p. 11-47, citing *Coger v. Wiltsey* (1931) 117 Cal.App. 652 [4 P.2d 302] and *Horning v. Shilberg, supra,* 130 Cal.App.4th at p. 207, fn. 8.)

[10] Although some courts, including the Supreme Court in *Nelson v. Fernando Nelson & Sons* (1936) 5 Cal.2d 511 [55 P.2d 859] (*Nelson*), have affirmed the award of "profits and increased market value" (*id.* at p. 517) in cases arising under section 3306 before its amendment, they did not countenance the award of lost profits as consequential or special damages. Rather, a closer look reveals that these simply affirm the traditional measure of damages under the statute as " 'the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, *at the time of the breach.* . . .' " (*Nelson,* at p. 518, italics added.) In

Section 3306 was amended in 1983 to eliminate a requirement of bad faith and to add consequential damages and interest to the damages recoverable for a breach of the agreement to convey an estate in real estate. (Stats. 1983, ch. 262, § 1, p. 806.) *Stevens Group Fund IV v. Sobrato Development Co.* (1991) 1 Cal.App.4th 886, 892 [2 Cal.Rptr.2d 460] (*Stevens Group Fund IV*) described the relevant legislative history of that amendment: "The summary of Assembly Bill No. 1068 explained the amendment as follows: 'Under existing law, the detriment caused by a breach of an agreement to convey real property is the price paid, expenses incurred, interest, and, in the case of bad faith, the difference between the agreed price and the value of the property plus expenses incurred in preparing to enter upon the land. [¶] This bill would delete the requirement of bad faith for recovery of the difference between the agreed price and the value of the property plus expenses in preparing to enter upon the land, and would also permit the recovery of other consequential damages and interest, as specified.'

"The Assembly Committee on Judiciary explained the inclusion of consequential damages in the proposed statute. 'This bill would permit the recovery of "consequential damages" for breach of a real property conveyance agreement. Generally, such damages are those which, in view of all facts known by the parties at the time of the making of the contract, may reasonably be supposed to have been considered as a likely consequence of a breach in the ordinary course of events. *This provision would conform the measure of damages in real property conveyance breaches to the general contract measure of damages which is specified in Civil Code 3300: ". . . all the detriment proximately caused (by the breach), or which, in the ordinary course of things, would be likely to result therefrom."* ' [¶] Thus, section 3306 provides that the measure of damages for plaintiff is the difference between the contract price and the fair market value of the property at the time of the breach plus consequential damages." (*Stevens Group Fund IV, supra*, 1 Cal.App.4th at p. 892, italics added.)

As explained by the Supreme Court in *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968 [22 Cal.Rptr.3d 340, 102 P.3d 257] (*Lewis Jorge*), a case involving breach of a construction contract and damages under the general contract measure of damages of section 3300: "Contractual damages are of two types—general

*Nelson,* the Supreme Court held the plaintiff (the buyer's assignee of a contract to sell real property) was entitled to "recover for profits and increased market value of the lots" where the seller's sale of the lots to a third purchaser for a profit "was in repudiation of plaintiff's rights after notice thereof . . . ." (*Id.* at p. 517.) The court further held that where the "lots had increased in market value from the date of the agreement *to the date of repudiation* by defendant," the plaintiff was entitled under section 3306 to recover the increased value of the lots, as set forth under the statute. (5 Cal.2d at pp. 517–518, italics added.)

damages (sometimes called direct damages) and special damages (sometimes called consequential damages). (24 Williston on Contracts [(4th ed. 2002)] § 64.1, pp. 11–12; 3 Dobbs, Law of Remedies (2d ed. 1993) § 12.2(3), pp. 39–42; see, e.g., *Erlich v. Menezes* (1999) 21 Cal.4th 543, 558 [87 Cal.Rptr.2d 886, 981 P.2d 978].)" "Unlike general damages, special damages are those losses that do not arise directly and inevitably from any similar breach of any similar agreement. Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties. Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test). [Citations.] Special damages 'will not be presumed from the mere breach' but represent loss that 'occurred by reason of injuries following from' the breach. [Citation.] Special damages are among the losses that are foreseeable and proximately caused by the breach of a contract. (Civ. Code, § 3300.)" (*Lewis Jorge*, at pp. 968–969.) "Lost profits, if recoverable, are more commonly special rather than general damages [citation], and subject to various limitations. Not only must such damages be pled with particularity [citation], but they must also be proven to be certain both as to their occurrence and their extent, albeit not with 'mathematical precision.' [Citations.]" (*Id.* at p. 975.)

■ Where "consequential damages" or special damages are recoverable for breach of contract not involving breach of a real property purchase agreement, they may include lost profits, where such profits are the natural and direct consequence of the breach, where the amount of the lost profits can be established with reasonable certainty, and where the seller knew of the buyer's intent to use the property for profit. (See § 3301.)

Appellant relies upon three cases decided after the 1983 amendment of the statute to support her contention that lost profits are never recoverable under section 3306: *Stevens Group Fund IV, supra*, 1 Cal.App.4th 886, *Reese v. Wong* (2001) 93 Cal.App.4th 51 [112 Cal.Rptr.2d 669] and *Horning v. Shilberg, supra*, 130 Cal.App.4th 197.

In *Stevens Group Fund IV, supra*, 1 Cal.App.4th 886,[11] the buyer contended the trial court had erred both in determining that section 3306 did not authorize the recovery of lost rents as consequential damages and in denying its request for specific performance. (*Stevens Group Fund IV, supra*, 1 Cal.App.4th at p. 888.) The Court of Appeal reversed the trial court's denial of the buyer's request for specific performance, but rejected the buyer's

---

[11] The Court of Appeal reversed the trial court's denial of the buyer's request for specific performance of a real property sales contract where the seller had been unable to convey clear title due to a lienholder's refusal to accept prepayment of a loan secured by the property. (*Stevens Group Fund IV, supra*, 1 Cal.App.4th 886, 889.)

contention that section 3306 authorized the recovery of lost rents and lost profits as consequential damages. (1 Cal.App.4th at pp. 889, 892.) The court held that lost rents received from lease of the property were not properly an item of consequential damages "in this case" (*id.* at p. 892), as the buyer's experts had included these rents as part of their capitalized income and comparable sales approaches to determining fair market value. Hence, to award market value and also rental profits as consequential damages in the circumstances would have permitted a double recovery. (*Id.* at pp. 891–893.)[12] Similarly, the court rejected the buyer's claim that it was entitled to *either* the difference between the contract price and fair market value *or* consequential damages as alternative measure of damages, stating, "[t]he language of the statute is clear. It does not provide for alternative measures of damages." (*Stevens Group Fund IV, supra,* 1 Cal.App.4th at p. 893.) *Stevens Group Fund IV* did not hold that lost profits—from rents or otherwise—were not recoverable as consequential damages under section 3306 in an appropriate case.

Nor do we read *Reese v. Wong, supra,* 93 Cal.App.4th 51, as holding that lost profits may never be awarded in an appropriate case as consequential damages under section 3306. In that case, Division One of this court rejected the buyer's claim that the trial court had erred in refusing to instruct the jury that the measure of damages for breach of a contract to sell commercial real property under section 3306 was the difference between the contract price and the fair market value of the property *at the time of trial*, rather than at the time of breach, as specified in the statute. (*Reese,* at pp. 53–54.) The buyer had been denied specific performance of the contract and the property had been sold for a price in excess of the contract by the time of trial. The buyer sought that difference between the contract price and the property value at the time of trial as his damages. The appellate court quoted the statute both before and after its 1983 amendment and observed that "[b]oth versions of section 3306 include the same unambiguous language regarding the price value differential, and courts have consistently read that language according to its plain meaning. [Citations.]" (*Id.* at pp. 55–56, 60.) The court rejected the buyer's contention that following the amendment to section 3306 to allow recovery of consequential damages, the appreciation in value of the property from the time of breach to the time of trial constituted consequential damages within the meaning of the statute and the contemplation of the Legislature. (*Reese,* at pp. 59–61.) The court relied upon the courts' consistent reading of

---

[12] The buyer had also offered as evidence of lost profits the receipt of two offers to purchase the property for more than the contract price before the sale was to close. (*Stevens Group Fund IV, supra,* 1 Cal.App.4th at p. 890.) However, upon the court's *tentative* ruling that such evidence was inadmissible, the buyer did not seek to introduce evidence of the two offers at trial. (*Ibid.*) Clearly, the buyer had waived any right to challenge the exclusion of this evidence on appeal by failing to pursue it at trial. It does not appear to have been an issue in the appeal.

section 3306 according to its plain language specifying the measure of damages as the difference between the price to be paid and the value of the property at the time of the breach. It concluded that in eliminating the bad faith requirement in 1983, the Legislature did not intend to change that measure of damages. (*Reese*, at p. 60.) "[N]othing in the legislative history of the amendment, which was discussed in *Stevens Group Fund IV . . . , supra*, 1 Cal.App.4th 886, suggests that the Legislature intended the radical change in the measure of damages that appellant espouses. On the matter of including consequential damages, the *Stevens* court noted a legislative committee report indicating that the provision would conform the measure of damages to the general contract measure specified in Civil Code section 3300. (*Stevens Group Fund IV, supra*, at p. 892.) One treatise writer has suggested that the amendment means that a buyer's lost profits could be recovered under appropriate circumstances, if the buyer purchased the property for purposes of resale and the seller was aware of the buyer's purpose. [Citation.] But the legislative history provides no support for appellant's theory that by expressly permitting the recovery of consequential damages, the Legislature impliedly intended to establish alternative measures of damages, with the price/market value differential based in some cases on the time of the breach and in others, on the time of the trial. 'The language of the statute is clear. It does not provide for alternative measures of damages.' (*Stevens Group Fund IV, supra*, at p. 893.)" (*Reese v. Wong, supra*, 93 Cal.App.4th at p. 60.) The court then continued: "We observe that appellant's theory of damages is incompatible with the principle that contract damages are ordinarily limited to those within the contemplation of the parties when they entered into the contract or to those reasonably foreseeable by them at that time. ' "This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." [Citation.]' [Citation.] Under appellant's novel theory, contract damages would be dependent not on the reasonable expectations of the parties at the time of their contracts, but on the fluctuations in the real estate market, the existence of congestion in the calendars of trial courts, and the success of the parties in delaying or advancing trial dates, depending on which tactic was to their advantage." (*Id.* at pp. 60–61.)

In rejecting the buyer's "novel theory" of damages, and continuing to read section 3306 as measuring damages for breach as the difference between the contract price and the market value of the property at the date of the breach, *Reese v. Wong* did not reject the legislative history described in *Stevens Group Fund IV, supra*, 1 Cal.App.4th at page 892, or the conclusion of Miller and Starr that lost profits may be available as consequential damages in appropriate cases. Rather, it rejected the contention that damages could be measured by the appreciation in the property's value *after* the date of the breach. The court also concluded that the buyer's theory was incompatible with the

requirement that contract damages must depend upon the reasonable expectations of the parties at the time of entering the contract, not upon market fluctuations and the vagaries of court calendars. (*Reese v. Wong, supra*, 93 Cal.App.4th at pp. 60–61.)

In *Horning v. Shilberg, supra*, 130 Cal.App.4th 197, the appellate court affirmed a judgment in favor of the defendant seller on the plaintiff buyer's claim for breach of contract to convey real property. The buyer contended that the court should have awarded him damages in the amount of lost resale profits based upon the difference between the contract price and the price the seller received when he sold the property to another party after his breach of the contract. The court held that upon the seller's breach of the contract, the buyer was entitled to damages specified in section 3306. The measure of the buyer's damages "was the difference between the purchase price and the fair market value of the . . . property on the date of breach (the market-contract differential), plus consequential damages according to proof. [Citations.]" (*Horning*, at p. 206.) However, the buyer failed to introduce evidence of the market-contract differential and so the court's finding of zero damages was upheld. (*Ibid.*) Instead, the buyer claimed he was entitled to the difference between the contract price and the price the seller received upon his later sale of the property. (*Id.* at pp. 206–207.) The court rejected this "alternative measure[] of damages," relying upon the holding of *Reese v. Wong, supra*, 93 Cal.App.4th 51, 61, that the unambiguous language of section 3306 did not authorize damages based on the value of the property at the time of trial. (*Horning v. Shilberg*, at p. 207.)

In *Stevens Group Fund IV, supra*, 1 Cal.App.4th 886, *Reese v. Wong, supra*, 93 Cal.App.4th 51, and *Horning v. Shilberg, supra*, 130 Cal.App.4th 197, the courts rejected the buyers' attempts to formulate alternative measures of damages to that provided by section 3306. In these cases, buyers did not seek the difference between the contract price and the market price on the date of breach, plus consequential damages. In *Stevens Group Fund IV*, the buyer sought the contract price-market value differential *plus* rental profits that had *already* been incorporated into the market value of the property at the date of breach or, in the alternative, *only* damages measured by the lost rent that he did not collect in the meantime. In both *Reese v. Wong* and *Horning v. Shilberg*, the buyers sought alternative damages measured by the value of the property, not at the date of breach, but at a later date. Moreover, in none of the foregoing cases does it appear that the buyer demonstrated the existence of the other requisites for an award of consequential or special damages, i.e., that the seller knew of the buyer's purpose in purchasing the property and that the anticipated profits were proved with reasonable certainty as to their occurrence and amount. In sum, none of these three cases holds that lost profits may not be recoverable as consequential damages in an appropriate

case, in addition to the basic measure of damages of the difference between the contract price and the value of the property at the time of the breach.

Other states have recognized lost profits as a component of consequential damages for breach of a contract for sale of land. (See 25 Williston on Contracts, *supra*, § 66:81 and text accompanying fn. 41, pp. 16, 21; 11 A.L.R.3d 719, §§ 2, 3[a] [most courts considering the issue have followed the general rule of damages and have allowed lost profits if foreseeable].) According to Williston, "[g]enerally, when the vendor under a contract for the sale of real estate wrongfully fails or refuses to convey, the aggrieved purchaser may recover, as general damages for the breach, the difference between the contract price and the market value of the land, plus interest on that amount. This measure gives the purchaser the benefit of the bargain if the property is worth more than the contract price. The aggrieved purchaser may also recover *special or consequential damages* that are the natural and proximate result of the vendor's breach, and that may reasonably be supposed to have been within the contemplation of the parties when the contract was made. . . . [T]he breaching vendor may be held liable for *profits lost* by the purchaser as a result of the breach, such as through an anticipated resale of the property, if they were within the contemplation of the parties at the time of contracting, and they are proven to be more than speculative, remote, or contingent." (25 Williston on Contracts, *supra*, § 66:81, pp. 17–20, italics added, fns. omitted.)

■ The plain language of section 3306, adding consequential damages to the general damages and other specified damages recoverable for breach of a contract to convey real property, the legislative history of the 1983 amendment acknowledging that the addition of consequential damages would conform the measure of damages to the general contract measure of damages (*Stevens Group Fund IV, supra*, 1 Cal.App.4th at p. 892), and the generally accepted inclusion of lost profits as a component of consequential or special damages in other breach of contract contexts and by other states in the context of breach of contracts to convey real property, taken together, persuade us that lost profits may be awarded as part of consequential damages under section 3306 upon a proper showing. We turn to the question whether Greenwich S.F. has made such a showing here.

## II. Lost Profits—Sufficiency of the Evidence

Appellant contends the evidence was insufficient to support the $600,000 award, as lost profits were not proved with reasonable certainty, and the prospect of profits after renovation was hypothetical and speculative.

## A.

At the outset, Greenwich S.F. argues that appellant waived her challenge to the sufficiency of the evidence of lost profits by failing to move for a new trial on the ground that the damages were excessive. We disagree.

■ "Ordinarily, errors are not waived on appeal by the failure to make a motion for new trial. [(See *Estate of Barber* (1957) 49 Cal.2d 112, 118–119 [315 P.2d 317].)] [¶] But there is one significant exception: A claim of excessive or inadequate damages cannot be raised on appeal unless appellant first urged the error in a timely motion for new trial [(Code Civ. Proc., § 657, subd. (5))]. The theory is that trial courts are in a better position than appellate courts to resolve disputes over the proper amount of damages. [(*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719–720 [79 Cal.Rptr.3d 561]; *County of Los Angeles v. Southern Calif. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121 [5 Cal.Rptr.3d 575].)]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:278, pp. 8-180 to 8-181 (rev. # 1, 2010), italics omitted.) "A failure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court. [Citation.] The power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662].) Thus, a party who first challenges the damage award on appeal, without a motion for a new trial, unnecessarily burdens the appellate court *with issues that can and should be resolved at the trial level. (Ibid.)* Consequently, if ascertainment of the amount of damages turns on the credibility of witnesses, conflicting evidence, or other factual questions, the award may not be challenged for inadequacy or excessiveness for the first time on appeal. (*County of Los Angeles v. Southern Cal. Edison. Co.[, supra,]* 112 Cal.App.4th 1108, 1121 . . . .)" (*Jamison v. Jamison, supra,* 164 Cal.App.4th 714, 719–720, italics added.)

However, it is also established that "the failure to move for a new trial does not preclude a party from asserting error in the trial of damages issues—e.g., erroneous evidentiary rulings, instructional errors, or failure to apply the proper measure of damages. [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:279, p. 8-181.)

We agree with appellant that the issue here is not a question of *excessive* damages, but whether the evidence was sufficient to support the award of lost profits in *any* amount. Unlike *Jamison v. Jamison, supra,* 164 Cal.App.4th 714, and the other cases relied upon by Greenwich S.F., the question whether substantial evidence supported the award of lost profits in this case does not turn on the credibility of witnesses or conflicting evidence, or other factual questions, but rather, whether under the facts viewed in the light most

favorable to Greenwich S.F., the award of any lost profits was unduly speculative and uncertain as a matter of law. We turn to that issue.

## B.

As our Supreme Court has recognized, where recoverable as consequential damages, lost profits are subject to various limitations. "Not only must such damages be pled with particularity [citation], but they must also be proven to be certain both as to their occurrence and their extent, albeit not with 'mathematical precision.' [Citations.]" (*Lewis Jorge, supra*, 34 Cal.4th at p. 975.)

We conclude that the occurrence and extent of the projected lost profits were not proven with the requisite *reasonable certainty* in this case. As we have recognized, no published California case of which we are aware has awarded lost profits to the buyer as consequential damages under section 3306 for the seller's breach of a real property purchase and sales agreement. Those treatises that suggest lost profits may be awarded in an appropriate case describe the appropriate circumstance as one in which the "buyer purchased the property for purposes of resale and the seller was aware of the buyer's purpose." (12 Miller & Starr, Cal. Real Estate, *supra*, § 34:45, pp. 34-160 to 34-161 (rel. 9/2008), fn. omitted; see Greenwald & Asimow, Cal. Practice Guide: Real Property Transactions, *supra*, ¶ 11:192, p. 11-47, citing *Coger v. Wiltsey, supra*, 117 Cal.App. 652 and *Horning v. Shilberg, supra*, 130 Cal.App.4th at p. 207, fn. 8.) Not only must the lost profits be "within the contemplation of the parties at the time of contracting" (25 Williston on Contracts, *supra*, § 66:81, p. 21, fn. omitted), but they must be "proven to be more than speculative, remote, or contingent." (*Ibid.*) None of the treatises on California law indicate that anticipated profits on a prospective residential redevelopment project such as this are sufficiently certain to be recovered as consequential damages.

■ Cases in related contexts, where lost profits are recoverable as consequential damages, confirm our conclusion that the evidence here was insufficient to support the award of lost profits. Section 3301 provides that "[n]o damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." "The general rule under this statute is that '. . . where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative.' (*Grupe* v. *Glick* (1945) 26 Cal.2d 680, 693 [160 P.2d 832].) However, *Grupe* . . . also stands for the exception to the rule: '[A]nticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' (*Ibid.*)" (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 493–494 [186 Cal.Rptr. 114].)

In *Grupe*, the exclusive agent for resale of defective oil refining machines was awarded lost profits he would have received on resale of the machines. Evidence concerning Grupe's sales expense and profit on the sale of each machine was admissible to show the net profit he would have made on additional sales of the machines. Combined with evidence that he was negotiating for and had offers for five additional machines at a set price, the trial court could properly estimate the prospective net profits he lost on the contemplated resale of the machines. (*Grupe v. Glick, supra*, 26 Cal.2d at pp. 693–694 (*Grupe*).) Nevertheless, the Supreme Court reversed the lost profits damage award and remanded with directions to determine the reasonable cost of the service agreed to be rendered by Grupe on the sale of each machine to reduce the amount recoverable by him. (*Id.* at p. 694.)

In *Lewis Jorge, supra*, 34 Cal.4th 960, the California Supreme Court cited *Grupe, supra*, 26 Cal.2d 680, as among those cases where lost profits from collateral transactions were awarded as a measure of *general damages* for breach of contract. (*Lewis Jorge*, at p. 972.) According to the court, "[l]ost profits from collateral transactions as a measure of general damages for breach of contract typically arise when the contract involves crops, goods intended for resale, or an agreement creating an exclusive sales agency. [Citations.]" (*Id.* at pp. 971–972.) The *Lewis Jorge* court held that lost profits a contractor may have earned on future projects it never won because of impaired bonding capacity suffered as a result of the breach of contract by a school district were not recoverable as general damages. (*Id.* at pp. 965, 973–975.)[13]

*Lewis Jorge, supra*, 34 Cal.4th 960, also concluded that those lost potential profits were not recoverable as special or consequential damages either. (*Id.* at pp. 975–977.) The contractor had sought to prove the extent of its lost future profits on unidentified construction projects, relying on its profitability during the four years preceding the breach and the testimony of its expert financial analyst. The financial analyst projected the loss at $95 million in gross revenue for future contracts that, based on its past history, the contractor would likely have been awarded at profit of about 6 percent of revenue, discounted to present value. (*Id.* at p. 966.) The Supreme Court recognized that lost profits are "frequently denied as too speculative" in circumstances where a contractor seeks lost profits it might have earned on unawarded contracts as special damages. (*Id.* at p. 975.) "These cases bar recovery of profits lost on future contracts not because the amount of the lost profits is

---

[13] We note it is doubtful that lost profits for breach of a real estate sales contract may ever be awarded as *general damages* under section 3306, as the plain language of that statute specifies the measure of such damages as "the difference between the price agreed to be paid and the value of the estate agreed to be conveyed at the time of the breach." (See *Reese v. Wong, supra*, 93 Cal.App.4th at p. 61; *Horning v. Shilberg, supra*, 130 Cal.App.4th at p. 207.)

speculative or remote, but because their occurrence is uncertain. [Citations.] [¶] California, likewise, has not upheld as special damages a contractor's unearned profits after breach of the construction contract. . . ." (*Id.* at p. 976.) Even in a case where the lost profits claim was for a sum certain and flowing from a particular project that the contractor would likely have won as low bidder, lost profits were rejected where the evidence was insufficient to enable the jury to conclude it was reasonably probable that the contractor would have earned a profit in the claimed amount. (*Id.* at pp. 976–977, citing *S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536–538 [30 Cal.Rptr.2d 286].) Despite testimony that the contractor's bonding capacity was reduced by its surety after termination of the contract and expert testimony projecting the amount of those lost profits based on past experience, the Supreme Court concluded that "the lost profits Lewis Jorge claimed it would have made on future construction projects were uncertain and speculative." (*Lewis Jorge*, at p. 977.)

Lost profits were similarly found to be uncertain and speculative in *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870 [116 Cal.Rptr.2d 158] (*Kids' Universe*), in which the court affirmed summary judgment on the ground the plaintiffs could not establish damages where their Web-based toy store was a new venture and they did not demonstrate that a triable controversy existed as to a reasonable certainty that the e-business would have made a profit. The plaintiffs presented evidence that they had five years of experience as toy retailers and their expert witness projected they would have made a healthy profit by comparing the proposed Web site with the success of another toy company operating on the Internet and similarly positioned to the plaintiffs at the time the plaintiffs expected to launch their Web site. (*Id.* at pp. 876–877.) The appellate court concluded the evidence was insufficient to raise a triable issue of material fact as to whether the plaintiffs would have realized net profits from the operation of their online business. (*Id.* at pp. 887–888.)[14]

---

[14] According to the Court of Appeal in *Kids' Universe, supra,* 95 Cal.App.4th at pages 887–888: "As substantial as plaintiffs' evidence sounds on the surface, we conclude it does not suffice to raise a triable issue as to lost *profits*. The evidence would not allow a reasonable trier of fact to find with reasonable certainty lost net *profits* from the unlaunched Web site by a preponderance of the evidence. [Citations.] This is because the evidence, while *suggesting* the Web site would have been viable, is not of a type necessary to demonstrate that a triable controversy exists *as to a reasonable certainty* that the unestablished business would have made a *profit*. Although plaintiffs had five years' experience as toy retailers, and had operated a Web site since 1995, they had not previously operated their Web site as a *profit-producing* venture. Plaintiffs' operation of the Kids' Universe Web site had in the past resulted in negligible revenues and therefore would not support an inference there were lost prospective *profits*. In addition, the on-line market for toys was not an established one. Further, the whole scenario presented by plaintiffs is rife with speculation. . . . Moreover, plaintiffs presented no evidence to the effect it was reasonably probable the venture would have been profitable, i.e., gains from on-line sales would have exceeded the costs of operating the Web site business. . . ." The appellate court concluded that the expert's "comparison of the proposed Web

In *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281 [61 Cal.Rptr.3d 243] (*Parlour Enterprises*), an action for breach of an agreement to subfranchise Farrell's Ice Cream Parlors, the Court of Appeal similarly found the evidence speculative and insufficient to show lost profits were reasonably certain to occur or the extent of any lost profits for three proposed restaurants. (*Id.* at pp. 288–289.) Specific plans for opening three of the restaurants had been developed, but they were not established businesses. Expert projections of lost profits did not support the lost profits award where the projections were not based on actual operations and the evidence of comparable businesses failed to show the profit and loss experience of these businesses were sufficiently similar to the subject Farrell's restaurants. (*Id.* at p. 290.)

The evidence in this case was insufficient to show that either Chan or Greenwich S.F. was an established business or had a track record of successfully developing or redeveloping properties. Chan testified to only two projects he worked on with Wong. On both projects it appears he acted as a contractor, and was paid as such, not as part of a development "team." He did not testify that either project made a "profit." Greenwich S.F. was a new venture, created for the purpose of buying the Greenwich Street property. Chan testified that only one of the three renovation projects he previously had undertaken with Lee had made a profit. He admitted he had no expectations about the certainty of any profit or the amount of any profit from renovation of the Greenwich Street property, stating repeatedly that he could not estimate what the profits would be, and that it would depend upon what square footage the City of San Francisco would approve. Asked what he expected to earn "*as a contractor*" (italics added) on the project, Chan stated, "[w]e based the calculation on the footage. Usually is $160 to $180 per square foot." He also stated, "the bigger the better, but it all depends on the approval from the City." He could not provide a "best estimate" of anticipated profits on the property after renovation, stating, "[i]t is useless to approximate because it all depends when you sell the structure."

■ Greenwich S.F. relied upon the existence of detailed and specific architectural plans for the renovation. The plans themselves underwent several revisions, perhaps most significantly changing in scope from a two-unit building to a single-family residence after the sales agreement was signed. The plans were not completed until nearly two years after the sales contract was signed. The existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits. (See *Parlour*

site with eToys's success does not suffice to raise a triable issue of material facts whether Kids' Universe would have realized net *profits* from the operation of its on-line business. Therefore, the trial court properly entered summary judgment in favor of the defendants." (*Id.* at p. 888.)

*Enterprises, supra,* 152 Cal.App.4th at pp. 288–290; *Kids' Universe, supra,* 95 Cal.App.4th at pp. 887–888.)

Miller's April 2008 "plans and specs" appraisal depended upon the nearly 4,000-square-foot residence being constructed according to the plans prepared by Li, without any changes. She acknowledged that she was not an expert with regard to development entitlements, but stated that "when there's a property sitting on a parcel in San Francisco and someone wants to improve, that they are allowed to improve it. *It just might be not to the size of property that they might originally want.*" (Italics added.) Her "plans and specs" appraisal necessarily was built on a hypothetical condition and it did not address the financial viability of the project. Miller herself acknowledged that the property's substandard lot would mean the developers would have to jump through "more hoops." Although it appears a permit was obtained in 2005, Lee testified that plaintiffs never paid for the permit because they never received the property. By the time of trial, the city's building department had sent the plans back for revision and the permit had expired. Greenwich S.F. never obtained a construction loan and no evidence was presented regarding the likelihood of obtaining such or the probable cost or terms of such a loan.

The dates of the Miller appraisals also present problems. The "as is" appraisal of the property and the "plans and specs" appraisal valued the property or proposed development as of April 2008. The passage of time between the signing of the sales contract in 2003 and the breach of the agreement by appellant, which occurred at the latest in 2005 when she refused Chan's request to transfer the property, render the valuation of the property in these appraisals unduly remote and speculative. (Plaintiffs' counsel conceded that the latest breach of contract date was Mar. 2006.) The April 2008 "plans and specs" appraisal necessarily incorporated into its estimation of market value, the appreciation in value (of both the land and the hypothetical residence) that had occurred from the date of the breach to the date of trial. Under *Reese v. Wong, supra,* 93 Cal.App.4th 51, that appreciation was not a proper component of the damages because the "contract damages would be dependent not on the reasonable expectations of the parties at the time of their contracts, but on the fluctuations in the real estate market, the existence of congestion in the calendars of trial courts, and the success of the parties in delaying or advancing trial dates, depending on which tactic was to their advantage." (*Id.* at pp. 60–61.) Miller's testimony that the prices of real estate in San Francisco and the particular neighborhood had been increasing over time focuses on appreciation of property values, rather than estimating the value of the property at the date of breach. This testimony was insufficient to support an award of lost profits on an unconstructed residence that possibly would have been sold to an unidentified and hypothetical purchaser more than two years after the breach of contract.

Furthermore, as the court here properly instructed the jury, to determine the amount of any lost profits, the jury must determine the gross amount plaintiffs would have received had the contract been performed and then subtract from that amount the costs, including the value of the property, that plaintiffs would have incurred had the contract been performed. Although the amount of lost profits need not be proved with mathematical precision, there must be a reasonable basis for computing the loss.

The evidence submitted on the cost to construct the proposed residence was sparse, at best. No expert testified directly as to the cost to construct the proposed residence. The "plans and specs" appraisal prepared by Miller stated that "[v]alues were established by both the limited available land sales and extrapolation (removing building values from the total value of similar properties in the area) using local builder estimates as well as Marshall Swift data." The "plans and specs" appraisal had a 2008 cost of $495 per square foot for 3,907 square feet of dwelling; $250 per square foot for 570 square feet of garage; and $100,000 for decks, landscape, etc., for a total of $2,176,465. This estimated replacement cost new was then "depreciated" by $30,000. Miller acknowledged that there should not be any depreciation on new construction. However, the computer program required it and "we can't take it out." Miller testified that the Marshall Swift cost data were usually low and that despite referring to this source in the appraisal, she did not actually look at the data in connection with the specific appraisal. Rather, Miller consulted with two local builders and her son, who was in the business of building bridges and tunnels. Neither of the other two local builders she contacted had looked at the plans for the residence. Miller herself had never done a cost budget for construction. Miller maintained that errors in the cost approach data did not harm the ultimate value of the appraisal based on the comparable sales approach. However, the only evidence presented as to the possible actual cost of construction (aside from the amounts expended by Greenwich S.F. to plan for development and to obtain necessary permits) was the cost per square foot estimate contained in the cost approach of the appraisal. Even if the "plans and specs" appraisal were considered to be a reasonable estimate of what the market value of a residence constructed according to the plans would be in 2008, the admitted problems with the cost approach would render the amount of lost profits completely speculative, as those costs of construction and related costs (and the value of the land itself) would need to be deducted from the market value of the property to arrive at an estimate of the amount of lost profits.[15]

---

[15] During closing argument, counsel for Greenwich S.F. argued that based on the "plans and specs" appraisal, the improved property would be worth $3,352,000. *"We estimate that the cost of the construction and the cost of acquisition to be $176,000.* The last word is the difference and damages based on its improved value is $1,492,000." (Italics added.) Counsel later pointed the jury to the appraisals, stating, "in those appraisals you'll see the figures that we wish you to

Miller also admitted that the majority of the "plans and specs" type appraisals she had done over the years were for lenders. The vast majority had approved plans in place, upon which she based her opinion. She thought she might have done one or two others, but she could not remember specifically any particular appraisal that she might have done without approved plans. There was no "approved plan" in place in 2008.

■ The lost profits claim was based on the assumption that Greenwich S.F. would have constructed the residence according to the plans and specifications without changes and that the venture would have been profitable. These assumptions were inherently uncertain, contingent, unforeseeable and speculative. The proposed real estate development project here involved numerous variables that made any calculation of lost profits inherently uncertain.[16] We conclude the evidence was insufficient to show lost profits with reasonable certainty.

### III. Award of $60,000 for Escrow Deposit

Appellant next contends the jury's award of $60,000 as damages for sums plaintiffs had deposited into escrow was erroneous, as the escrow was cancelled by mutual agreement and there was no evidence that the money was ever in appellant's possession or control. Evidence was presented that plaintiffs deposited a check written by Lee for $60,000 into escrow. The instructions cancelling escrow instructed the escrow company "to disburse funds held by you in escrow, in the amount of $60,000 . . . to Greenwich SF, LLC." No evidence was presented as to what happened to the funds following the cancellation of escrow. However, it has never been suggested that the money was returned to Greenwich S.F. During jury deliberations, the parties stipulated that "[i]n the event that the jury awards damages under item 9b, the $60,000 [deposited in escrow], it is agreed by the parties that if payment of the $60,000 is received by plaintiff from the title company which holds the money, that [appellant] will receive full credit for that payment." Given this stipulation, appellant cannot show she was prejudiced by the award. If the money is returned to Greenwich S.F., appellant will receive full credit for the payment. If not, "the price paid"—here plaintiffs' $60,000 deposit—is a proper component of damages pursuant to section 3306.

---

use in determining what is the fair market value of this property, and based upon that to determine the amount of damages you should award."

[16] Our resolution of this issue makes it unnecessary to further address appellant's contention that there was insufficient evidence that appellant knew of plaintiffs' plans to renovate or develop the property at the time she signed the contract. Nor need we address appellant's contentions (1) that the court erred in allowing Miller to testify to the market value of the property in April 2008; (2) that the "plans and specs" appraisal was inadmissible; and (3) that the court erred when it allowed Miller to testify beyond the scope of opinions set forth in her deposition that the value of the property since 2002 had increased over time.

Appellant claims that Greenwich S.F. relinquished its claim for return of its deposit by agreeing in the escrow cancellation instructions that "Buyer(s) and Seller(s) hereby mutually agree to release one another and First American Title Company from any and all liability in connection with this escrow." Appellant has waived any such claim by failing to raise it in the trial court below. (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 [72 Cal.Rptr.2d 232]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶¶ 8-229, 8-231, pp. 8-155, 8-156 (rev. # 1, 2009).) Appellant argues that the issue is one pertaining only to a question of law on undisputed facts that may be raised for the first time on appeal. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:237, p. 8-157 (rev. # 1, 2009).) It appears to us that the parties' vigorous dispute over the effect of cancelling the escrow makes it less than clear that the issue would entail purely a question of law. Moreover, the issue is one within our discretion, and we are not required to consider this new theory, even if it raised a pure question of law. (*Id.*, ¶ 8:240.1, pp. 8-159 to 8-160 (rev. # 1, 2009); *Hussey-Head v. World Savings & Loan Assn.* (2003) 111 Cal.App.4th 773, 783, fn. 7 [4 Cal.Rptr.3d 171].)[17]

## IV. Award of $90,000 Expended Toward Renovation

Appellant contends the evidence of amounts expended by Greenwich S.F. toward renovation of the property was insufficient to support the award of $90,000 in damages for sums paid as costs in preparation for renovation of the property. Here, appellant acknowledges that there was testimony by Lee regarding payments Greenwich S.F. and Chan had made, along with Lee's handwritten notes regarding costs. Nevertheless, appellant challenges *each item* making up the $90,000 award on the grounds that there was no evidence other than Lee's handwritten account supporting the award or that Lee's testimony was not otherwise supported by cancelled checks or the like. Thus, appellant's challenge is based on a claim of *excessive* damages. In this instance, appellant's failure to move for a new trial on the issue of the sufficiency of damages waives this challenge to the excessiveness of the $90,000 award for prerenovation costs. (*Schroeder v. Auto Driveaway Co., supra*, 11 Cal.3d 908, 919; *Jamison v. Jamison, supra*, 164 Cal.App.4th 714, 719–720.)

Were we to conclude otherwise, we would find the $90,000 damage award supported by substantial evidence, including Lee's testimony and his handwritten itemization, described above. The testimony of one witness may

---

[17] Greenwich S.F. contends that appellant's failure to move for a new trial precludes her raising this issue on appeal, as it goes to the issue of excessive damages. We reject this assertion for the reasons set forth in connection with our discussion of the lost profits issue. (See *ante*, pt. II.A., pp. 759–760.)

provide substantial evidence. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 8:52, p. 8-23 (rev. # 1, 2010).) Cancelled checks or official documentation of the costs incurred are not required to support the jury's award. The absence of such documentation goes to the weight of the evidence and the credibility of the witness. Those determinations are for the jury.

## V.   Attorney Fees

On appeal from the attorney fee award (case No. A124882), appellant asks that if the judgment is reversed, the attorney fee award be reversed as well. She has challenged neither the amount nor the legal bases for the fee award should the judgment be affirmed. We here reverse the award of $600,000 for lost profits. As this constitutes the bulk of the damages awarded, the trial court should have the opportunity to reconsider its award of attorney fees. We are not suggesting that the remaining damages awarded to Greenwich S.F. would not support the amount of attorney fees awarded, a question we do not address. However, this determination is for the trial court to make in the first instance.

Greenwich S.F. seeks its attorney fees on appeal, contending that even were the judgment reversed in part, it was still the prevailing party for costs and attorney fee purposes if it retained a net monetary recovery. (Code Civ. Proc., §§ 1032, 1033.5, subd. (a)(10); Civ. Code, § 1717.) On appeal, Greenwich S.F. retained only $150,000 of its $750,000 jury verdict, 20 percent of that award, not including attorney fees. In the interest of justice, we conclude that the parties should each bear their own costs and attorney fees in connection with these appeals.

## DISPOSITION

The judgment (case No. A123670) is reversed insofar as it awards lost profit damages to Greenwich S.F. We order the judgment modified to correct the clerical error so that the judgment reflects that respondent Greenwich S.F. was the sole plaintiff as of the date the verdicts were rendered and thereafter. In all other respects the judgment is affirmed. The award of attorney fees (case No. A124882) is reversed and the case is remanded to the trial court to

allow it to redetermine the amount of attorney fees to Greenwich S.F. as the prevailing party below. In the interest of justice, the parties are to bear their own costs and attorney fees in connection with both these appeals.

Lambden, J., and Richman, J., concurred.